MILTON L. SCHWARTZ, District Judge:
 

 Shepherd Machinery Company (“Shepherd”), appellee herein, is a California corporation engaged in the business of selling and leasing heavy construction equipment in Southern California. J. A. Thompson & Son, Inc. (“Thompson”) was, at the time here in question, a California corporation engaged in construction work. On April 6, 1973 Thompson entered into two agreements with Shepherd, each entitled “Machinery Lease,” whereby Thompson leased two compactors and two bulldozers for a term of one year, the term being automatically renewed until termination of the lease either by Thompson by way of written notice to Shepherd or by Shepherd upon the default of Thompson. In conjunction with the leases Thompson acquired an option to purchase the compactors and bulldozers for a price determined pursuant to a formula whereby Thompson received full credit against the option purchase price for all rentals paid.
 

 At the time the leases and option to purchase were executed, Thompson was engaged in construction activities in California and Hawaii and maintained offices in both states. Shepherd did not file financing statements covering the equipment in either state. However, about one year pri- or to the execution of the leases, Shepherd had filed a financing statement in California which named Thompson as debtor and which covered “after acquired” property.
 

 Thompson utilized the construction equipment leased from Shepherd on two construction sites in Southern California. By January 24, 1974 Thompson was in serious default on its lease payments. On that date between 4:30 and 4:35 p. m., Pacific Standard Time, Shepherd attempted to repossess the compactors and bulldozers. However, because employees of Thompson had
 
 *944
 
 drained the fuel lines and removed the fuel regulators from the equipment and had barricaded the equipment with other heavy equipment, Shepherd was unable to remove the compactors and bulldozers from the two construction sites. Shepherd was, however, able to place several 4V2" X 6" bright red stickers on the equipment. These stickers announced that the heavy equipment was the property of Shepherd and warned all unauthorized persons against tampering therewith.
 

 Approximately twenty minutes after Shepherd placed the stickers on the equipment, Thompson filed a petition for relief under Chapter XI of the Bankruptcy Act.
 
 [1]
 
 Two days later, Shepherd removed the heavy equipment from the Thompson construction sites.
 

 In the subsequent Chapter XI proceedings, Shepherd filed a proof of claim for $55,807.20, the amount allegedly owed by Thompson to Shepherd under the equipment leases. Thompson’s receiver, Ralph Aoki, appellant herein, responded by filing a “Complaint re Objection to Claim and Counterclaim” wherein he alleged that Shepherd’s repossession of the equipment was either a voidable preference or conversion of property belonging to the estate of the debtor. The receiver thereafter moved for summary judgment.
 

 The bankruptcy judge granted the motion in part, ruling that as a matter of law Shepherd had only a security interest, rather than a lessor’s reversionary interest, in the heavy equipment. With respect to the issue of perfection of Shepherd’s security interest, either by way of filing or possession, the bankruptcy judge ordered that the matter proceed to trial. At the close of trial the bankruptcy court ruled that pursuant to Calif.Comm.Code § 9103, as in effect at the time of Thompson’s Chapter XI filing (“§ 9103”),
 
 [2]
 
 perfection by filing required the filing of a financial statement in the State of Hawaii. Thus, Shepherd’s previous filing in California was deemed inadequate. The bankruptcy court also ruled that Shepherd’s placement of the red stickers on the construction equipment was insufficient to establish possession for purposes of perfection under Calif.Comm.Code § 9305 (“§ 9305”).
 
 [3]
 

 
 *945
 
 Shepherd appealed to the district court. The district court upheld the ruling of the bankruptcy court with respect to the nature of Shepherd’s interest in the compactors and bulldozers. However, on the grounds that the bankruptcy court had misapplied both § 9103 and § 9305, the district court reversed the rulings of the bankruptcy court on the issues of perfection.
 

 Aoki now appeals from the rulings of the district court reversing the bankruptcy court on the issues of perfection. Shepherd challenges the conclusion of both the district court and the bankruptcy court that it has only a security interest, rather than a lessor’s reversionary interest, in the construction equipment.
 
 [4]
 
 We affirm.
 

 Reversionary Interest or Security Interest
 

 The threshold question in this appeal is whether Shepherd has a lessor’s reversion-ary interest or merely a creditor’s security interest in the construction equipment. Neither Shepherd nor Aoki disputes the fact that should the lease agreements be construed to be “true” leases, Shepherd would retain a lessor’s reversionary interest in the heavy equipment and would be entitled to prevail. On the other hand, if the lease agreements are determined to be merely security devices, Shepherd can prevail only if it perfected its security interests.
 
 See
 
 Calif.Comm.Code § 9301.
 

 When the leases were executed, Shepherd granted Thompson a written option to purchase the compactors and bulldozers for the value specified in the option, and notedc in the leases, with full credit of rental payments toward the purchase price. If rent payments covered the value of the equipment, the only additional charges would be certain taxes and an add-on charge of
 
 5l/z%
 
 per annum from the date of the lease. Both the lower courts ruled that this purchase option transformed the leases, as a matter of law, into agreements “intended as security” pursuant to Calif.Comm.Code § 1201(37).
 
 [5]
 
 Shepherd maintains that the lower courts erred in so ruling.
 

 The lower courts interpreted subsection (b) of § 1201(37) as establishing conclusively that irrespective of any other facts concerning the transaction, a lease agreement is intended for security and, thus, subject to the provisions of Article 9 of the Uniform Commercial Code, if it contains an option to purchase “for no additional consideration or for nominal consideration.” Calif.Comm. Code § 1201(37)(b). A considerable number of courts are in accord.
 
 [6]
 
 The construction
 
 *946
 
 given § 1201(37) by these courts and by the lower courts in the instant case was aptly outlined by the Supreme Court of Oregon:
 

 At first glance the provisions of the above section [U.C.C. § 1201(37)] may be somewhat confusing, probably because they are stated in the inverse order of importance. However, upon a careful reading of the entire section it is clear that the first question to be answered is that posed by clause (b) — whether the lessee may obtain the property for no additional consideration or for a nominal consideration. If so, the lease is intended for security. If not, it is then necessary to determine “by the facts of each case” whether the lease is intended as security and, in making that determination, the fact that the lease contains an option to purchase “does not [of itself] make the lease one intended for security.”
 

 The cases construing the above section have uniformly held that if the lessee, upon compliance with the lease, has the option to purchase the property for no additional consideration, or for a nominal consideration, the lease is a security interest as a matter of law. . . .
 

 Peco, Inc. v. Hartbaaer Tool & Die Co.,
 
 262 Or. 573, 500 P.2d 708, 709-10 (1972).
 

 Shepherd argues that subsection (b) of § 1201(37) should not be so interpreted, and that in
 
 every
 
 case whether a lease is intended as a security device must be determined by considering
 
 all
 
 of the salient facts. A very few courts have adopted this approach.
 
 See, e. g., In re Cedar Valley Bandag, Inc.,
 
 29 U.C.C.Rep. 984 (N.D.Ga.1980) (Bankruptcy Judge);
 
 In re Samoset Associates,
 
 24 U.C.C.Rep. 510 (D.Minn.1978) (Bankruptcy Judge);
 
 Computer Sciences Corp. v. Sci-Tek, Inc.,
 
 21 U.C.C.Rep. 859 (Del.Super.Ct.1976).
 
 [7]
 

 We are not convinced by Shepherd’s argument. Section 1201(37) makes it clear that the question whether a lease was “intended as security” is determined by reference to the intention of the parties at the time the transaction was consummated. In general, this intention is to be inferred from the facts of each case. In subsections (a) and (b), however, two plain rules of construction are set out. While a purchase option does not in itself make a lease one intended for security (§ 1201(37)(a)), a purchase option exercisable for no or nominal additional consideration “does make” the lease one intended for security (§ 1201(37)(b)). We conclude from this that subsection (b) provides an exception to the
 
 *947
 
 general rule, whereby one fact in a given case takes on determinative significance. Thus, if a lease contains an option to purchase “for no additional consideration or for nominal consideration,” it is conclusively presumed to be “intended as security,” without reference to other facts from which the opposite inference might be drawn.
 

 The written option granted to Thompson permitted it to purchase the compactors and bulldozers for little additional consideration. In fact, the add-on charge is really no more than a carrying or finance charge. Subsection (b) of § 1201(37) is clearly applicable, and the lower courts were correct in ruling, as a matter of law, that the equipment leases here in question were agreements intended for security. The fact that Thompson subsequently defaulted on the leases, thereby rendering the option subject to cancellation by Shepherd, is irrelevant. Whether a lease agreement is a true lease or one intended for security is determined by the intent of the parties at the time of execution of the agreement. To base such a determination on subsequent events, such as default of the lessee, is to permit, in the words of the district court of Maine, “chameleon” leases.
 
 In
 
 re
 
 Vaillancourt, 1
 
 U.C.C.Rep. 748, 763 (D.Maine 1979) (Bankruptcy Referee).
 

 Perfection of the Security Interest
 

 In order to prevail against the receiver in the instant action, Shepherd must have perfected its security interest in the compactors and bulldozers prior to Thompson’s Chapter XI filing.
 
 See
 
 Calif.Comm.Code § 9301. Shepherd maintains that it did so both by filing, Calif.Comm.Code §§ 9401
 
 et seq.,
 
 and by taking possession of the equipment, Calif.Comm.Code § 9305. The question of perfection in this case, however, cannot be resolved merely by examining Shepherd’s actions in light of Calif.Comm. Code §§ 9401
 
 et seq.
 
 and 9305. The compactors and bulldozers in question are “goods of a type which are normally used in more than one jurisdiction.” Calif.Comm. Code § 9103, as in effect on January 24, 1974. Thus, the initial question with respect to perfection in this case concerns the choice of law provisions of § 9103, which specify that California law is to govern the validity and perfection of a security interest if the debtor’s “chief place of business” is in California and that “[otherwise, the law ... of the jurisdiction where such chief place of business is located shall govern.”
 

 The parties vigorously disagree as to the location of Thompson’s “chief place of business” during the relevant time period. The receiver maintains that it was in Hawaii. Shepherd insists that it was in California. The parties do agree, however, that if Thompson’s “chief place of business” was in California, Shepherd properly perfected its security interest in the equipment by filing, Calif.Comm.Code §§ 9401
 
 et seq.,
 
 and the issue of perfection by possession need not be reached. Likewise, the parties agree that if Thompson’s “chief place of business” was in Hawaii, Shepherd did not perfect its security interest by filing and the issue of perfection by possession becomes crucial.
 

 The bankruptcy court held an evidentiary hearing on the issue and, based on the following “findings of fact,” concluded that during the relevant period of time Thompson's “chief place of business” was in Hawaii:
 

 (15) During the year 1973, the Debtor was engaged in the construction business and in construction projects in the States of Hawaii and California and maintained offices in each of those states.
 

 (16) During the year 1973, the Debtor’s President, Richard Depweg, and two of its Vice-Presidents, Tom Frandsen and Brian Cook, were all located in, and operated out of, the Debtor’s Hawaii office and were responsible for the Debtor’s Hawaii construction projects.
 

 (17) During the year 1973, one of the Debtor’s Vice-Presidents, Robert Powers, was located in and operated out of the Debtor’s Los Angeles office and had responsibility for its California construction projects. Mr. Powers had no responsibilities in connection with the Debtor’s Hawaii operations. Leone Senecal, the Debtor’s Controller, was also located in
 
 *948
 
 the Los Angeles office. Ms. Senecal had no responsibilities in connection with the Debtor’s Hawaii operations, other than the consolidation of financial information which was prepared by the accounting staff of the Hawaii office regarding the Debtor’s Hawaii operations, and forwarded to her, with information which the Los Angeles office prepared regarding the California operation and the preparation of consolidated payroll reports and tax returns for the company.
 

 (18) During the year 1973, John Thompson, the Chairman of the Debtor’s Board of Directors, spent in excess of 50% of the time which he devoted to the Debt- or’s business affairs in the State of Hawaii and at the Debtor’s Hawaii office.
 

 (19) During the years 1972 and 1973, the Debtor derived approximately two-thirds of its gross revenues from its operations in the State of Hawaii.
 

 (20) At all times during the year .1973, and, more particularly, at the time that the Agreements described in Paragraph 1 of these Findings were executed and entered into, the main part of the Debtor’s business operations was located in the State of Hawaii.
 

 (21) During the year 1973, that portion of the Debtor’s business operations which was conducted in Hawaii was managed and run by and from the Hawaii office.
 

 (22) During the year 1973, the majority of the Debtor’s creditors were located in the State of Hawaii.
 

 (23) During the year 1973, the Debtor’s Hawaii office handled negotiations with suppliers and vendors who supplied goods and services in connection with Hawaii construction projects. The Debtor’s Hawaii office alone received invoices from creditors who supplied goods and services in connection with Hawaii construction projects, and that office was exclusively responsible for paying those creditors. Inquiries and invoices from creditors in Hawaii were received by the Hawaii office, and not by the Los Angeles office.
 

 (24) The Hawaii office maintained its own, separate accounting staff, which was responsible for maintaining the books and records of the company’s Hawaii operations.
 

 (25)During the year 1973, Richard Depweg, the President of the Debtor, was responsible for overall supervision of the company’s operations. John Thompson did not participate in the majority of the operating decisions regarding the company and did not insist on taking part in the majority of those decisions.
 

 Record on Appeal, pp. 32-34.
 

 The district court reversed the bankruptcy court on the ground that the lower court had erred in not giving sufficient consideration to other relevant facts, such as:
 

 (39) J. A. THOMPSON AND SON, INC. was at all times a California corporation.
 

 (40) At all times during its existence, J. A. THOMPSON AND SON, INC. maintained offices on Hindry Avenue in Los Angeles, California.
 

 (41) Until the early 1970’s, the Debtor [sic] gross receipts from California operations exceeded its gross receipts from its operations in Hawaii.
 

 (42) During 1972 and 1973, the Debtor held all of its Board of Directors meetings at either its Hindry Avenue offices or at the offices of its attorneys in Los Angeles, California.
 

 (43) The Debtor’s 1972 and 1973 Federal Income Tax returns were prepared by its accountants in Los Angeles, California and filed from Los Angeles, California.
 

 (44) During 1972 and 1973, the Debt- or’s payroll records were consolidated in Los Angeles, California and its payroll taxes were paid from Los Angeles, California.
 

 (45) On May 22,1972, the Debtor designated its Hindry Avenue, Los Angeles, California address as its Chief Place of Business on a Financing Statement given to Shepherd.
 

 (46) During 1972 and 1973, the Debtor designated its Hindry Avenue address on twenty-one (21) other Financing Statements filed by creditors as its chief place of business.
 

 
 *949
 
 (47) During 1972, the Debtor realized $8,472,397.00 in sales from its California operations. During 1973, the Debtor realized $10,123,368.00 in sales from its California operations.
 

 (48) During 1972 and 1973, the company’s audited financial statements were prepared by its Los Angeles, California accounting firm.
 

 (49) In the Statement of Affairs filed by the Debtor in these proceedings on May 23, 1974, it stated its address as 8330 Hindry Avenue, Los Angeles, California.
 

 Record on Appeal, pp. 54-55.
 
 [8]
 
 The district court also considered it highly relevant that Thompson had refused to supply Dun & Bradstreet with current credit information and that Dun & Bradstreet listed Thompson’s Los Angeles office as its headquarters and its Hawaiian office as a branch.
 

 Essentially, the two lower courts disagreed as to the nature of the inquiry required by § 9103(2). The bankruptcy court perceived the “chief place of business” inquiry as focusing first on business volume and second on the expectations of those creditors dealing with the operation or division producing the greatest business volume. On the other hand, the district court construed § 9103(2) as requiring an inquiry into the principal place of management of a debtor’s entire multi-state operation and into the reasonable expectations of all creditors in light of available credit information.
 

 There are surprisingly few cases interpreting § 9103(2).
 
 See, e. g., In re Dobbins,
 
 371 F.Supp. 141, 14 U.C.C.Rep. 796 (D.Kan.1973);
 
 In re Brown,
 
 5 U.C.C.Rep. 401 (W.D.Mich.1968);
 
 Associates Financial Services Co., Inc. v. First National Bank,
 
 82 Mich.App. 495, 266 N.W.2d 490, 24 U.C.C.Rep. 420 (Mich.App.1978);
 
 Moody Day Co. v. Westview National Bank, Waco,
 
 7 U.C.C.Rep. 425 (Tex.Crt.App.1970). None is particularly instructive.
 
 Associates Financial Services Co., Inc. v. First National Bank, supra,
 
 suggests that business volume is highly relevant to the “chief place of business” inquiry.
 
 In accord, Tatelbaum v. Commerce Investment Co.,
 
 7 U.C.C.Rep. 406 (Md.App.1970). On the other hand,
 
 Moody Day Co. v. Westview National Bank,
 
 Waco,
 
 supra,
 
 suggests that business volume is not of critical importance.
 

 The only real guidance to the proper interpretation of § 9103(2) appears in the Official Comment following the section and in the notes of the Review Committee and the Official Comment accompanying § 9103 as revised in 1972 (“revised § 9103”).
 
 [9]
 
 The Official Comment following § 9103(2) provided in pertinent part that:
 

 “Chief place of business” does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. That is the place where persons dealing with the debtor would normally look for credit information, and is appropriate for filing. The term “chief place of business” is not defined in this Section or elsewhere in this Act.
 

 Clearly the drafters of § 9103(2) contemplated a two-fold inquiry focusing first on the “place from which . .. the debtor manages the main part of his business operations,” and second, on the reasonable expectations of creditors. With respect to the debtor’s “place of management” the comment is somewhat confusing. On the one hand the comment could be read as referring to the location of the central or executive management of the debtor’s multi-
 
 *950
 
 state operation. On the other hand, the comment could easily be read as referring to the place from which the single largest plant or project of a multi-state operation is managed on a daily basis. If the latter location is intended, then business volume generated by any given plant or project is crucial to the “chief place of business” inquiry.
 

 The subsequent revision of § 9103 greatly assists in clearing up this confusion over the proper interpretation of “place of management.”
 
 [10]
 
 Revised § 9103 provides in pertinent part:
 

 (d) A debtor shall be deemed located at his place of business if he has one, at his
 
 chief executive office
 
 if he has more than one place of business, otherwise at his residence.
 

 (emphasis added). Thus, the inquiry with respect to “place of management” focuses on the location which serves as executive headquarters for the debtor’s multi-state operation, and not on the location which generates the largest business volume.
 
 See
 
 Preliminary Draft No. 2 at 38, Review Committee for Article 9 of the U.C.C. (1979).
 
 [11]
 
 This is unquestionably a sound approach to the “place of business” inquiry and an approach which fosters a certain degree of stability in the debtor-creditor relationship, as the location of the chief executive offices of a multi-state enterprise is far less likely to change than the relative business volume generated by its various plants or operations.
 

 We conclude, therefore, that the district court, rather than the bankruptcy court, correctly construed § 9103(2). Specifically, the bankruptcy court erred in making the business volume of Thompson’s Hawaiian operation its initial and paramount concern. No doubt business volume will be a relevant consideration in those cases wherein chief executive offices cannot readily be identified. Even in such cases, however, other factors must be considered, such as the location of Board of Directors’ meetings, management offices, payroll and other business records.
 

 The bankruptcy court also erred in considering only the expectations of Hawaiian creditors in determining the place “where persons dealing with the debtor would normally look for credit information.” Official Comment to Calif.Comm.Code § 9103(2). The Official Comment does not suggest that courts may consider only the expectations of creditors dealing with the plant or operation that happens to be generating the greatest business volume for the debtor at that time. The Comment refers without limitation to “persons dealing with the debtor.” Thus, in determining where creditors “normally look for credit information,” courts should consider the reasonable expectations of a representative number of creditors.
 

 While the reasonable expectation of creditors is an important consideration when determining the location of a debtor’s “chief place of business,” it is by no means determinative. Section 9103 does not establish any sort of estoppel principle. A creditor is not entitled to prevail on the “chief place of business” issue merely because he relied upon representations of the debtor as to the latter’s “chief place of business.” It has long been the rule that creditors have a duty to acquaint themselves with the facts necessary to enable them to file in accordance with the commercial codes.
 
 See In re P. S. Products Corp.,
 
 7 U.C.C.Rep. 411 (E.D.N.Y.1970),
 
 aff’d sub nom. P. S. Products Corp v. Equilease Corporation,
 
 435 F.2d 781 (2d Cir. 1970);
 
 In re Flynn,
 
 6 U.C.C.Rep.
 
 *951
 
 1119 (E.D.Mich.1969),
 
 citing In re Golden Kernal, Inc.,
 
 5 U.C.C.Rep. 43 (E.D.Pa.1968).
 

 Since the bankruptcy court erroneously construed § 9103(2), the district court properly reversed its determination that Thompson’s “chief place of business” was Hawaii. Whether it was proper for the district court to examine the facts independently is another question. Aoki contends that the district court erred in not applying the “clearly erroneous” standard of review,
 
 see
 
 Bankruptcy Rule 810, to the “chief place of business” issue. We disagree. The determination of Thompson’s “chief place of business” was, in this case, an issue of law. Where, as here, the underlying facts are not disputed, the issue is only what legal conclusion should be drawn from them. It is well-established that neither Bankruptcy Rule 810 nor FRCivP 52(a) preclude a reviewing court from independently examining a bankruptcy court’s legal conclusions.
 
 In re Visiting Home Services, Inc.,
 
 643 F.2d 1356, 1358-59 (9th Cir. 1981) (under old bankruptcy rules);
 
 In re Howell,
 
 638 F.2d 81, 82 (9th Cir. 1980). The “clearly erroneous” standard of review is applied where a trial court resolves disputed issues of fact by reference to the credibility of conflicting evidence. It has no application where the trial judge applies a legal standard to undisputed facts.
 

 Upon review of the record before it, this court is of the opinion that the district court correctly concluded that during the time in question Thompson’s “chief place of business” was located in California. This being so, § 9103(2) dictates that the law of California govern the perfection of Shepherd’s security interest in the compactors and bulldozers. As the parties acknowledge, California Commercial Code §§ 9401
 
 et seq.
 
 permit perfection by way of a previously filed financing statement covering after acquired property, such as that filed by Shepherd with the Secretary of State of California in 1972. Shepherd thereby perfected its security interest in the heavy equipment prior to the time of Thompson’s Chapter XI filing.
 
 [12]
 

 The judgment of the district court in favor of Shepherd is AFFIRMED.
 

 [1]
 

 . Since Thompson filed its petition prior to October 1, 1979, this action is governed by the (“old”) Bankruptcy Act, 11 U.S.C. §§ 1
 
 et seq.,
 
 prior to its amendment on November 6, 1978 by P.L. 95-598.
 

 [2]
 

 . Calif.Comm.Code § 9103, as in effect at the time in question, provided in pertinent part:
 

 (2) If the chief place of business of a debt- or is in this State, this division governs the validity and perfection of a security interest and the possibility and effect of proper filing with regard to general intangibles or with regard to goods of a type which are normally used in more than one jurisdiction (such as automotive equipment, rolling stock, airplanes, roadbuilding equipment, commercial harvesting equipment, construction machinery and the like) if such goods are classified as equipment or classified as inventory by reason of their being leased or held for lease by the debtor to others. Otherwise, the law (including the conflict of laws rules) of the jurisdiction where such chief place of business is located shall govern. If the chief place of business is located in a jurisdiction which does not provide for perfection of the security interest by filing or recording in that jurisdiction, then the security interest may be perfected by filing in this State. For the purpose of determining the validity and perfection of a security interest in an airplane, the chief place of business of a debtor who is a foreign air carrier under the Federal Aviation Act of 1958, as amended, is the designated office of the agent upon whom service of process may be made on behalf of the debtor.
 

 [3]
 

 .Calif.Comm.Code § 9305, as in effect at the time in question, provided:
 

 A security interest in letters of credit and advices of credit (subdivision (2)(a) of Section 5116), goods, instruments, negotiable documents or chattel paper may be perfected by the secured party’s taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party’s interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this division. The security interest may be otherwise perfected as provided in this division before or after the period of possession by the secured party. (Stats. 1963, c. 819, § 9305.)
 

 [4]
 

 . Shepherd did not file a formal notice of appeal from the decision of the district court, but challenges the ruling concerning the nature of its interest in the equipment in its responding brief. The receiver does not question the propriety of considering the merits of Shepherd’s arguments. This court has ruled that a non-appealing appellee may raise errors below in order to sustain the judgment below.
 
 See United States v. Campbell,
 
 293 F.2d 816 (9th Cir. 1961). Should this court conclude that Shepherd has a lessor’s reversionary interest rather than a mere security interest in the equipment, it would have to sustain the judgment of the district court in favor of Shepherd.
 
 See
 
 4A Collier on Bankruptcy (14th ed.) § 70.18 at • 230-231. Accordingly, it is appropriate to consider in this appeal Shepherd’s challenge to the ruling of the courts below.
 

 [5]
 

 . California Commercial Code § 1201(37) provides in pertinent part:
 

 ... whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for nominal consideration does make the lease one intended for security.
 

 [6]
 

 . Percival Const. Co. v. Miller & Miller Auctioneers,
 
 532 F.2d 166 (10th Cir. 1976);
 
 In re Mountain Valley Const. Co., Inc.,
 
 29 U.C.C.Rep. 1034 (W.D.Pa.1980) (Bankruptcy Judge);
 
 In re Butcher Boy Meat Market, Inc.,
 
 29 U.C.C.Rep. 649 (E.D.Pa.1980) (Bankruptcy Judge);
 
 In re Johnson,
 
 28 U.C.C.Rep. 802 (D.Del.1979) (Bankruptcy Judge);
 
 In re Joe Necessary & Son, Inc.,
 
 27 U.C.C.Rep. 551 (W.D.Va.1979);
 
 National Equipment Rental, Ltd. v. Priority Electronics
 
 Corp., 435 F.Supp. 236, 22 U.C.C.Rep. 280 (E.D.N.Y.1977);
 
 In re Vaillancourt,
 
 7 U.C.C.Rep. 748 (D.Maine 1979) (Bankruptcy Referee);
 
 In re Royer’s Bakery, Inc.,
 
 1 U.C.C.Rep. 342 (E.D.Pa.1963) (Bankruptcy Referee);
 
 State Bank of Burleigh County Trust Co. v. All-American Sub, Inc.,
 
 289 N.W.2d 772, 28 U.C.C.Rep. 1083 (N. Dakota 1980);
 
 U.C. Leas
 
 
 *946
 

 ing, Inc. v. Laughlin,
 
 606 P.2d 167, 28 U.C.C.Rep. 806 (Nev.1980);
 
 Eimco Corp. v. Sims,
 
 100 Idaho 390, 598 P.2d 538, 27 U.C.C.Rep. 823 (Idaho 1979);
 
 FMA Financial Corp. v. Pro-Printers,
 
 590 P.2d 803, 25 U.C.C.Rep. 950 (Utah 1979);
 
 Federal Sign & Signal Corp. v. Berry,
 
 601 S.W.2d 137, 29 U.C.C.Rep. 1404 (Tex.Civ.App.1980);
 
 All-States Leasing Co. v. Ochs,
 
 42 Or.App. 319, 600 P.2d 899, 27 U.C.C.Rep. 808 (Or.App.1980);
 
 Tackett v. Mid Continent Refrigerator Co.,
 
 579 S.W.2d 545, 26 U.C.C.Rep. 764 (Tex.Civ.App.1979);
 
 Triple C. Leasing v. All-American Mobile Wash,
 
 64 Cal.App.3d 244, 134 Cal.Rptr. 328 (Cal.App.1976);
 
 United Rental Equipment Co., Inc. v. Potts and Callahan Contracting Co., Inc.,
 
 231 Md. 552, 191 A.2d 570, 1 U.C.C.Rep. 351 (Md.App.1963).
 

 [7]
 

 . The theory which apparently underlies the decisions in these cases and which serves as the basis for Shepherd’s argument was articulated by Peter F. Coogan in
 
 Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1-201(37) and Article 9,
 
 5 Duke Law Journal 909 (1973). Coogan maintains that the Uniform Commercial Code must be interpreted in light of pre-code law, specifically the Uniform Conditional Sales Act (“UCSA”). Since the UCSA required that the purchaser be obligated to pay an amount substantially equal to the purchase price of the property before a transaction could be deemed a conditional sale, Coogan contends that before a lease can be subject to the provisions of . Article 9 of the Uniform Commercial Code, the lessee must be obligated to pay in rent an amount substantially equivalent to the designated purchase price of the property. When a lessee has the right to terminate a lease before making such an equivalent payment, as does Thompson in the instant case, he has not really assumed an obligation that would satisfy the requirements of the UCSA. Thus, Coogan argues, a right to terminate by the lessee before an amount equivalent to the purchase price is paid should, for purposes of determining whether a lease is intended for security, outweigh the impact of an option to purchase for nominal consideration, leaving the agreement a “true” lease.
 

 Although Coogan’s theory has some historical appeal, we remain unpersuaded.
 

 [8]
 

 . These facts were not included by the bankruptcy court in its formal findings of fact and conclusions of law. Rather, they appeared initially in Shepherd’s request to the bankruptcy court that it amend its findings to include such facts. The bankruptcy court declined to amend its findings, apparently on the ground that additional findings were not necessary to support its ruling. It is unusual to say the least that reviewing courts are presented with “facts” in addition to those set forth in the findings of the lower court. In the instant case these facts are crucial,
 
 see
 
 discussion
 
 infra
 
 at 950. Furthermore, they are undisputed. It was therefore not reversible error for the district court to consider them in resolving the issues raised by this appeal.
 

 [9]
 

 . Although § 9103 of the Uniform Commercial Code was formally revised in 1972, the revision did not become effective in California until 1976.
 
 See
 
 Calif.Comm.Code § 11101.
 

 [10]
 

 . The receiver objects to any consideration of revised § 9103 on the ground that it was not the law in effect on the relevant date of January 24, 1974. However, a “subsequent amendment and its legislative history, although not controlling, is nonetheless entitled to substantial weight in construing the earlier law.”
 
 May Dept. Stores, Co. v. Smith,
 
 572 F.2d 1275, 1278 (8th Cir. 1978).
 

 [11]
 

 . The Committee stated therein:
 

 The Committee recommends that the place of business used where there is more than one be redesignated chief executive office instead of “chief place of business.” This will emphasize that what is intended is the executive office rather than either a statutory office or the site of the largest plant.
 

 [12]
 

 . Having determined that Shepherd perfected its security interest in the compactors and bulldozers by filing, this court need not consider whether Shepherd also perfected its interest by possession pursuant to California Commercial Code § 9305.
 
 See
 
 discussion
 
 supra
 
 at 947.