**In re ASTROCADE, INC. fka: Astrovision, Inc., Debtor.**

**Bankruptcy No. 2–82–04677.**

United States Bankruptcy Court, S.D. Ohio, E.D.

June 2, 1983.

George R. Nickerson, Scott, Walker & Kuehnle, Columbus, Ohio, for trustee.

Craig M. Stewart, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, Trustee.

Gary D. Greenwald, Schottenstein, Zox & Dunn, Columbus, Ohio, for Union Bank.

J. Ralston Werum, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Nitron, Inc.

Frederick M. Luper, Zacks, Luper & Wolinetz Co., LPA, Columbus, Ohio, for official Creditor's Committee.

## ORDER REGARDING SECURED STATUS OF UNION BANK AND NITRON, INC.

THOMAS M. HERBERT, Bankruptcy Judge.

This matter is before the court for consideration of the status of Union Bank (Bank) and Nitron, Inc. (Nitron), as creditors of the above-captioned debtor in this Chapter 11 proceeding. None of the participants has objected to this court's exercise of jurisdiction herein, none of the participants has requested that this cause be certified to the district court for decision, and the court is acting in this proceeding pursuant to the Emergency Rule promulgated by the United States District Court for the Southern District of Ohio on December 27, 1982, as upheld in *White Motor Co. v. Citibank (In re White Motor Co.)*, 704 F.2d 254 (6th Cir.1983).

Astrocade, Inc. is the debtor in a Chapter 11 proceeding filed with this court on December 29, 1982. The Bank is a creditor alleging to have a perfected security interest in debtor's accounts receivable, inventory, chattel paper, furniture, fixtures, equipment, and general intangibles. Nitron likewise claims to be a creditor with a perfected security interest in debtor's accounts receivable, equipment, furniture, and general intangibles. Debtor listed both obligations as disputed on its A–2 schedule in its Statement of Affairs.

The issue of the Bank's secured status first arose in connection with the Bank's Verified Complaint To Modify Stay, for Injunctive Relief and for Appointment of Trustee, filed on January 3, 1983 in Adversary No. 2–83–0003. In paragraphs 6 and 7 of that complaint, the Bank alleged that it holds a claim against debtor secured by the above-mentioned assets in the approximate amount of $3,220,000 as of October 29, 1982. In paragraph 15, the Bank stated further that it has not been offered, and does not have, adequate protection for its secured interest in debtor's assets.

Debtor's answer of January 31, 1983 admitted the execution of the loan and security agreement in favor of the Bank, but denied the remainder of paragraphs 6 and 7 of the complaint "for want of knowledge and information sufficient to form a belief as to the truth of the matter set forth therein." Debtor denied the allegations of paragraph 15.

On February 2, 1983, the court continued the automatic stay imposed by 11 U.S.C. § 362(e) until the final hearing on the Bank's complaint set for February 18, 1983. Following that final hearing, the court denied the Bank's request for relief from the stay, and found that the request for injunctive relief and for appointment of a trustee

had become moot. The Bank was given leave to renew its complaint for relief from stay if debtor's pending contract with ITT–SEL did not materialize.

Concurrently with the Bank's complaint for relief from stay, debtor, on January 4, 1983, filed an Application for Authority to Use, Sell or Lease Cash Collateral. In its application, debtor stated that Union Bank and Nitron, Inc. appeared to be creditors claiming security interests in debtor's accounts receivable. Debtor alleged that both parties claiming security interests in cash collateral were adequately protected within the meaning of 11 U.S.C. § 361, and sought court authorization to use necessary cash generated from its accounts receivable. Various orders giving temporary use of limited funds have been entered, and each has preserved the issue of the perfection of these security interests. On January 31, 1983, debtor filed a more extensive Application for Authority to Use, Sell or Lease Cash Collateral, followed by a Supplemental Application on February 15, 1983. The applications for the use of cash collateral and the final hearing on Union Bank's Complaint for Relief from Stay were set for hearing and were heard by the court on February 18, 1983.

Although the hearings on February 18 were not consolidated, issues overlapped and testimony was considered in both as to the issue of adequate protection. Debtor's response to the Bank's and Nitron's demands for adequate protection specifically raised the issue of the validity of both security interests. Evidence was adduced by all participants concerning the filing of documents in various places for the purpose of perfecting the security interests at issue. At the close of all the evidence, the parties rested and closing arguments were presented. Astrocade argued that neither the Bank nor. Nitron had established that it had perfected its security interest under the laws of Ohio prior to the filing of the Chapter 11 petition. Hence, Astrocade asserted that the two creditors were without standing to claim a secured interest in the assets under consideration. Claiming surprise, the Bank and Nitron moved to reopen plaintiff's case for the purpose of supplementing the record with additional evidence of the location of Astrocade's chief executive office during the time involved. Based solely upon an exercise of its equitable powers, the court sustained the motion on March 25, 1983, and set the matter down for further hearing on April 8. In order to complete discovery, the parties were granted two mutual continuances and the hearing was held on May 6, 1983. Post-hearing briefs were filed and the issue is now before the court for disposition.

It is uncontroverted that, at some time, Astrocade had places of business in both Ohio and California. Furthermore, both states have adopted Article 9 of the Uniform Commercial Code (UCC), including the 1972 amendments. This chapter of the UCC deals with secured transactions, which the two states have chosen to codify in mainly identical language. A significant difference between the states exists, however, because of the wording chosen by the Ohio General Assembly in enacting R.C. 1309.38(A)(3) (UCC 9–401). In California, a security interest in accounts receivable and inventory is perfected by filing a financing statement in the office of the Secretary of State. California Comm.Code § 9401(1)(c) (UCC 9–401). But in Ohio, a filing with the Secretary of State must be supplemented with a local filing in the office of the County Recorder in the county where the debtor has a place of business, if that is the sole county in the state wherein the debtor conducts such business. R.C. 1309.38(A)(3).

It is agreed that prior to February 25, 1983 and March 14, 1983, Nitron and the Bank, respectively, had only filed financing statements in the offices of the Secretary of State of California, Ohio, and Iowa. On those respective dates, Nitron and the Bank also filed such statements with the Franklin County Recorder in Columbus, Ohio. Among other things, therefore, it becomes necessary to determine which state law governs the perfection of these security interests.

R.C. 1309.03(C)(2) and Calif.Comm.Code § 9103(3)(b) provide:

The law, including the conflict of laws rules, of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of the security interest.

As can be seen, the above enactment requires the court to decide where Astrocade was "located" at the times pertinent to this cause.

R.C. 1309.03(C)(4) and Calif.Comm.Code § 9103(3)(d) state:

A debtor shall be deemed located at his place of business if he has one, at his chief executive office if he has more than one place of business; otherwise at his residence . . .

From this enactment it becomes clear that, within the meaning of the applicable statutes, Astrocade's location was at all times that of its chief executive office.

Finally, Astrocade's "location" bears directly upon the effect of R.C. 1309.03(C)(5) and Calif.Comm.Code § 9103(3)(e) which declare:

A security interest perfected under the law of the jurisdiction of the location of the debtor is perfected until the expiration of four months after a change of the debtor's location to another jurisdiction, or until perfection would have ceased by the law of the first jurisdiction, whichever period first expires. Unless perfected in the new jurisdiction before the end of that period, it becomes unperfected thereafter and is deemed to have been unperfected as against a person who became a purchaser after the change.

It is not disputed that sometime in late 1981 or early 1982, Astrocade opened an office in Rancho Cordova, California. The Columbus, Ohio office was still maintained and, until the California office was closed in early December 1982, Astrocade did business through both offices. The Bank and Nitron contend that when the California office was established, it became the chief executive office of Astrocade and remained such until it was closed and all operations reverted to Columbus. Astrocade asserts that the Columbus office was always its chief executive office, and that although certain bookkeeping functions were transferred to California, the company was never operated from that state.

Analyzing the positions of the parties in light of the statutes pertinent to this dispute, it is evident that if Astrocade's chief executive office were in California when the security interests were perfected there, the Bank and Nitron had four months from early December 1982 in which to perfect their interests in Ohio by filing the necessary documents with the Franklin County Recorder. R.C. 1309.03(C)(5). If Astrocade's chief executive office were always located in Columbus, however, the Bank's and Nitron's attempt to perfect their interests in Ohio on March 14, 1983 and February 25, 1983 must fail, since they are precluded from such action by 11 U.S.C. § 362(a)(4) and (5), and the exception in 11 U.S.C. § 362(b)(3) is not applicable. Obviously, under such an interpretation of the evidence, the Bank and Nitron never perfected their liens in Ohio.

Before considering the evidence presented by the parties bearing upon the location of Astrocade's chief executive office, a controlling legal definition of "chief executive office" must be determined. The Bank and Astrocade cite the official comments to R.C. 1309.03 and Calif.Comm.Code § 9103 as follows:

'Chief executive office' does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. This is the place where persons dealing with the debtor would normally look for credit information, and is the appropriate place for filing. The term 'chief executive office' is not defined in this section or elsewhere in this act. Doubt may arise as to which is the 'chief executive office' of a multi-state enterprise, but it would be rare that there could be more than two possibilities. A secured party in such a case may easily protect himself at no

great additional burden by filing in each possible place.

In *Aoki v. Shepherd Machinery Co. (In re Thompson & Son, Inc.)*, 665 F.2d 941 (9th Cir.1982), the court considered the issue at bar, and cited the above official comment. At p. 950 of the opinion the court states:

... Specifically, the bankruptcy court erred in making the business volume of Thompson's Hawaiian operation its initial and paramount concern. No doubt business volume will be a relevant consideration in those cases wherein chief executive offices cannot readily be identified. Even in such cases, however, other factors must be considered, such as the location of Board of Directors' meetings, management offices, payroll and other business records.

Also at p. 950 of its opinion, the court notes:

... The Comment refers without limitation to "persons dealing with the debtor." Thus, in determining where creditors "normally look for credit information," courts should consider the reasonable expectations of a representative number of creditors.

The above statements by the court of appeals go directly to the formulation of a test for determining location of a chief executive office. Less directly, the court appeared to include other ingredients in the formula, such as street addresses, sales revenue, place where preparation and filing of federal income tax returns occurred, designation of Chief Place of Business on financial statements, location of company auditors, address in Dunn & Bradstreet, and the address listed by the company in its Chapter 11 Statement of Affairs. It is interesting to note that the bankruptcy court based its decision in *Aoki* upon numerous facts, including that the company President and two of its vice presidents were located in Hawaii, the Board Chairman spent over 50% of his company time at the Hawaii office, approximately two-thirds of the company's gross revenues were generated in the Hawaii office, and the Hawaii office maintained its own, separate accounting staff and its own books and records. The district court reversed the bankruptcy court for failing to give "sufficient consideration" to the other facts of record, and the Court of Appeals affirmed. It is clear that the court of appeals does not mandate that business volume and personnel location be disregarded, but does state that those items must not be emphasized at the expense of documentary evidence. The court declares that the location of a chief executive office must be determined upon a case by case basis.

Prior to the closing statement of Astrocade in the hearing of February 18, it is apparent that no one connected with the Bank or Nitron was seriously concerned about the question of locating Astrocade's chief executive office. The claimants knew that perfection of their interests must be established, but evidently were unaware of the crucial development which was brewing. Testimony suggesting the Columbus location of the office was not vigorously attacked and, at one spirited point in the proceedings, the Bank's co-counsel, Mr. Rubin, proclaimed:

Your honor, we concede that the company was located in Columbus, Ohio.

When the magnitude of the argument of Astrocade's counsel sank in, the Bank's rather solicitous attitude towards the question was galvanized into an urgent appeal to the court's discretion.

Not surprisingly, the evidence presented subsequent to the court's reopening of the hearing clashed. Trial testimony either waivered or became a crescendo of certitude, depending upon which side of the case was on the witness stand. Due to the distant locations of witnesses, much testimony was obtained by deposition. The imperfection of human recollection surfaces in numerous instances in some of these transcripts. The documentary evidence contains letters written upon Columbus letterhead stationery and Rancho Cordova letterhead stationery. Billings, credits, and other such business records appear with one or the other address, not exclusively Columbus or Rancho Cordova. Advertising contained

the Columbus address, inventory was in California or other locations. The intercreditor agreement binding Astrocade, Nitron, and the Bank dated October 29, 1982, states that Astrocade has "a principal place of business" in Rancho Cordova. Astrocade's Statement and Designation By Foreign Corporation, filed with the California Secretary of State's office on May 13, 1982, declares that Astrocade's "principal executive office" is at the Columbus address. Michael Peck, Astrocade's President from November 1, 1981 through early February, 1982, testified that the chief executive offices were moved from Columbus to Rancho Cordova, and were at that location when he left the company. Peck's successor, Roger Greenman, testified at the hearing that the "headquarters" of Astrocade was located at the Columbus address "in 1982." When company operations were moved to Rancho Cordova, notice of that address was sent to creditors, vendors, and distributors. No such notice of a move to Columbus was ever sent. These are but a few examples of the conflicting evidence in this case upon the question of the location of Astrocade's chief executive office. Fortunately, however, significant evidence exists which is either not in conflict or only minimally so. Following the holding of the 9th Circuit Court of Appeals in *Aoki, supra,* leads the court to consider the following established facts as persuasive that the chief executive office of Astrocade was located in Rancho Cordova from November, 1981 until its return to Columbus in early December, 1982.

1. Auditing of Astrocade functions by outside accountants were conducted at the Rancho Cordova office by California auditors.

2. Dunn and Bradstreet reports for 1982 all state that the company's principal office was in Rancho Cordova, with a branch sales office located in Columbus.

3. The vast majority of Astrocade's creditors, including the Bank (in December, 1981), Nitron (in June, 1982), and both such creditors again in October of 1982, were led to expect that the primary operating offices of Astrocade were located in Rancho Cordova.

4. All bookkeeping and accounting was done in Rancho Cordova, including the vast majority of invoicing and collection.

5. The presidents of the company during late 1981 and most of 1982 spent no practical amount of time in the Columbus office.

6. All payroll activities, except limited Columbus payroll needs, were conducted in and emanated from Rancho Cordova.

7. All financing (except petty cash) and banking was done in California or New York.

8. Most incoming telephone calls dealing with the daily operation of the company were directed to Rancho Cordova.

9. The vast majority of company administrative functions were centered in Rancho Cordova or New York during the final months of the existence of the California office.

10. A management team selected in early 1982 to analize company operations spent the vast majority of its time and energy working in the offices at Rancho Cordova, some in New York, and practically none in Columbus.

11. Inventory production and management was not handled in Columbus, and a majority of such activity was conducted in Rancho Cordova.

12. All significant corporate planning and management decisions were made in either Rancho Cordova or New York between February and December, 1982.

13. All significant books, records, and financial documents were maintained and kept at Rancho Cordova.

14. Accounts payable and company checks were, mainly, kept and executed in Rancho Cordova.

15. All federal, state, and local tax returns for Astrocade were prepared and mailed from Rancho Cordova.

16. All shipments of finished goods were from California or Iowa, none from Columbus.

17. Quality control for the company's products was headquartered at Rancho Cordova.

18. Returns and equipment repairs were handled in California or Iowa.

19. When discussions were conducted between Quaker Oats and Astrocade involving significant advances of capital, the meetings took place in the Rancho Cordova offices.

Astrocade points out that it is basically a sales and marketing concern and argues, therefore, that since those functions never left Columbus the company's chief executive office was necessarily located there. As *Aoki, supra,* teaches, however, generation of business volume is not the *sine qua non* of chief executive office location. Astrocade's vice president in charge of sales resided in Columbus and worked out of that office, but the record shows that he was often gone for many days at a time, keeping in contact with his secretary by telephone. The court cannot find that this company was being managed and operated from its Columbus office, when the totality of the evidence is considered.

As suggested heretofore, the court has incorporated into its factual determinations what it perceived to be considerations of probable bias, other questions of credibility, witnesses' ability to know whereof they spoke, and witness-stand demeanor where applicable. These factors, along with all of the evidence adduced, leads to the conclusion that the Bank and Nitron have borne successfully the burden of establishing the perfection of their security interests in Ohio.

Astrocade has been operating under successive orders of this court for the limited use of cash collateral. In view of the within decision regarding Nitron's and the Bank's security interests, it is now settled that the participation of these secured creditors in future uses of cash collateral is required, and further hearings upon such uses will be scheduled at the request of the parties concerned.

IT IS SO ORDERED.