**In re STANDARD FINANCIAL MANAGEMENT CORP., d/b/a New England Rare Coin Galleries, Debtor.**

**Bankruptcy No. 87–10219–HL.**

United States Bankruptcy Court, D. Massachusetts.

Sept. 17, 1987.

---

Joseph F. Ryan, Special Counsel, Thomas Bean, and William R. Baldiga, Counsel to Special Counsel, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for debtor.

Cyril Hochberg, P.C., Boston, Mass., for New England Merchants Funding Corp.

## MEMORANDUM ON ADMINISTRATIVE LEASE CLAIM

HAROLD LAVIEN, Bankruptcy Judge.

Before the Court is New England Merchants Funding Corporation's ("Funding Corporation") Motion for an Allowance of Administrative Expense and Request for Payment for computers and peripherals allegedly leased to the debtor. The Court is asked to determine if the lease is, in fact, a security agreement or a true lease.

### Factual Background

The Bank of New England, N.A. ("the Bank") served as a source of financing for the debtor. The Bank provided the debtor with a revolving loan, with a limit of $1,000,000 dollars. The rate of interest on the revolving loan was set at the Bank's prime rate, plus one (1%) percent per annum. In addition, the Bank subsidiary, the Funding Corporation, financed the purchase of four units of computer hardware. The financing agreement was called a lease. Two of the alleged leases provided for payments over 60 months and two over 48 months. After all lease payments were made, the debtor was obligated to purchase the leased equipment at 20% of Funding Corporation's acquisition cost.

### Parties' Intent

The parties' intent can be determinative at the time the transaction was completed, as to the contract being a conditional sale or a lease. *In re J.A. Thompson & Son, Inc.*, 665 F.2d 941 (9th Cir.1982). "In general, this intention is to be inferred from the facts of each case." *Id.* at 946. The Court will examine the intentions of the parties through both the lease and any admissible evidence of the circumstances. If the parties intended the lessor (Funding Corporation) to retain ownership of the equipment and the lessee's intention was simply to pay for the use of equipment, then the contract is a lease. On the other hand, if the parties intended the lessee (debtor) to actually be or become the owner of the equipment, then the parties entered into an agreement intended to serve as a conditional sale.

### Deriving Intentions from the Four Corners of the Agreement

 This Court adopts the 16–part test of *In re Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr.D.Conn.1980) as an aid in determining if a lease is a true lease or is actually intended as a security agreement. *In re Mariner Communications*, 76 B.R. 242, 245–246 (Bankr.D.Mass.1987). The 16–part test does not preclude the Court from looking at substance over form when deciding if a transaction is a lease or conditional sale. *In re Mohawk Industries, Inc.*, 49 B.R. 376, 378 (Bankr.D.Mass.1985). The sixteen criteria are:

(1) whether there was an option to purchase for a nominal sum;

(2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment;

(3) whether the nature of the lessor's business was to act as a financing agency;

(4) whether the lessee paid a sales tax incident to acquisition of the equipment;

(5) whether the lessee paid all other taxes incident to ownership of the equipment;

(6) whether the lessee was responsible for comprehensive insurance on the equipment;

(7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense;

(8) whether the agreement placed the entire risk of loss upon the lessee;

(9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee;

(10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee;

(11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment;

(12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement;

(13) whether there was a default provision in the lease inordinately favorable to the lessor;

(14) whether there was a provision in the lease for liquidated damages;

(15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor [and];

(16) whether the aggregate rentals approximate the value or purchase price of the equipment.

■ The thrust of this inquiry is an attempt to serve as something of a check list of those attributes most commonly associated with ownership rather than rental, and while no single item by itself would be conclusive, a preponderance of these provisions in a document would strongly militate against the intent of the parties to create a true lease.

■ An examination of the leasing agreement, signed August 22, 1985, between the Funding Corporation and the debtor (master lease), under the *Brookside Drug* test reveals that the debtor bears most of the burdens of ownership. In fact, under at least 11 parts and, arguably, two or three more of the 16–part test, the debtor can be and is found to have the responsibility of ownership.

### Debtor's Multiple Ownership responsibility—Parts 3, 5, 6, 7, 10, 12, 15, and 16

The identity of the Funding Corporation as a subsidiary of the Bank satisfies part 3 of the test, while the requirements of the master lease causing the payment by the debtor of a taxes incident to ownership except for the sales tax, to pay for insurance, maintenance, and all other expenses, and bear the risk of loss satisfying parts 5, 6, 7 and 8 of *Brookside's* test on where the burden of ownership falls. Part 9 is satisfied by the ability of the Funding Corporation to accelerate payments on default and part 10 is met as the equipment was selected and purchased to meet the specific requirement of the debtor. Part 12 and at least part 4, in part, is covered when the master lease requires the debtor not only to join in and provide all necessary filings to protect the Funder's interest, but further requires an as is purchase at the acquisition price, plus sales tax, if there is a filing defect. Part 15 of the test is met as the debtor waives all warranties and the right to protest late delivery and limiting the time the equipment can be rejected for defects. Part 16, with a reasonable allowance for the added expense of casting this sale in the form of a lease, the aggregate of the rentals approximate the purchase price of the equipment.

*Acceleration/Default Clauses—Parts 8, 9, 10 and 13*

The lease contains very onerous provisions in case of default and/or acceleration of payments. The lease includes many events of default including relatively minor ones such as making a payment late by five days and filing for bankruptcy. Furthermore, paragraph 10 of the lease provides that when the equipment is irreparable, stolen, or otherwise unusable, the debtor must render all amounts due under the lease to the Funding Corporation at the end of that month. These default provisions are sufficiently burdensome to satisfy the 13th criteria.

The first of the *Brookside* tests deals with the important question of an option to purchase. Here, there is not an option, but a requirement to purchase, certainly a strong indication of the real intention of the parties. This element will be treated in greater length, subsequently.

Interestingly, any payments made on account of the acceleration are to be discounted 6% per annum. The 6% discount strongly suggests that the lease is a conditional sale and the debtor receives a discount for early payment.

### Indications of Ownership by the Bank's Conduct

Paragraph 7 allows Funding Corporation to require the debtor to place a sign on the leased equipment, stating it belongs to Funding Corporation, however, Funding Corporation did not do so. No explanation was offered for the failure to observe this potential important protection.[1]

### Comparison of Lease Costs With Probable Conditional Sale Price

The four leases provided for the debtor to render monthly lease payments and a final payment of 20% of the acquisition price to receive ownership of the leased goods. The Court asked both parties to compare the total cost of the leases to the cost of financing the purchase of the computer equipment through a time purchase. The Funding Corporation states that the cost of a conditional sale would have been the cost of borrowing money from the revolving loan. The interest charged on the revolving loan fund was 1% over the Bank's prime rate. The Special Counsel argued that based upon the obsolescent factor that reduced its security value, the cost of financing the conditional purchase of computer equipment, and even more so as the auxiliary equipment anyone financing a sale over several years would require more points, would be two to five percent above the prime rate.

The debtor obtained two units of computer hardware in 1985 and two units in 1986. The prime rate was 9.5% in 1985, and 7.5% in 1986. Therefore, the cost of borrowing money from the revolving loan was 10.5% in 1985, and was 8.5% in 1986. Special Counsel, in his computation, used 12.5% for the first items and 11.5% for the remaining two. The total lease payments averaged over the life of the lease would equal approximately a loan of 12% in 1985 and 11.5% in 1986. In actual dollar terms, the lease costs would be $480,132.28; Special Counsel's cost would be $470,369.74; the revolving fund would be $447,524.10. The contention that the purchase of the computers over a five-year period, and the ancillary equipment over a four-year period could be accomplished at 1% over prime, seems highly doubtful. Without delving too far into the realm of what ifs, no testimony was offered on the point, it seems highly likely that the rate would be somewhat higher for loans secured by collateral with such a high rate of obsolescence. One might conjecture that if 1% over prime were really available, the debtor would not be willing to pay over five years of a de-

---

**1.** The Court notes two provisions that are consistent with a lease, one of which was relatively inconsequential as to the equipment involved. Paragraph 15 provides that Funding Corporation must approve all subleases. In addition, paragraph 6 does not allow the debtor to add equipment that will impair the functioning of the leased equipment without Funding Corporation's permission. Notwithstanding these few indications to the contrary, the major terms of the agreements in both number and importance meet most of the 16 *Brookside Drug* tests for a security agreement, rather than a lease.

creasing interest rate, a fixed rate amounting to 2.5% to 4 percent over prime. Further, it is clear that to have used the revolving fund to finance the purchases, would have consumed over one-third of its limits. It is clear to this Court that a company would and did pay a higher interest rate to assure that it's operating funds are not exhausted by financing long-term capital purchases. I would further expect that the debtor would seek competitive rates and, therefore, conclude that the market rate would be greater than Funding Corporation's suggested 1% over prime and closer to what the debtor was actually paying with the debtor willing to pay something extra for Funding Corporation's added expense in structuring the transaction to assume the form of a lease.

### Intent

The Funding Corporation does provide us with the intent of the parties at the time of signing the lease. In its memorandum, the Funding Corporation states, "... the debtor, apparently for tax and accounting purposes, preferred a leasing arrangement, thereby being able to deduct as an expense all the equipment lease payments rather ..." than purchase the equipment. Undeniably, tax minimization motivates people to cast transactions in a format that disguises their reality. The debtor's desire to cast their purchase of computers into the form of a lease in order to receive tax deductions for lease payments does not alter the parties' actual intention to finance the purchase which would ultimately be consummated by the mandatory purchase requirement.

### Mandatory Purchase

The lease requires the debtor to purchase the leased equipment at 20% of Funding Corporation's acquisition costs at the end of the lease. This presents two questions. The first issue is, how small a percent of a purchase price will an option or obligation to the purchase of a lease be considered nominal? The second issue is the effect of not an option, but a requirement to purchase.

A sister court in this district considered 25% or less of the purchase price to be nominal. *In re Access Equipment, Inc.*, 62 B.R. 642 (Bankr.D.Mass.1986). Combined with the other factors outlined in *Brookside Drug*, a 20% option might well be considered to be within the parameters of the term, "nominal"; however, the Court in this case, does not base its finding on this issue since the agreement contemplates not an option, but a mandatory purchase.

■ The question of whether a true lease can require the lessor to purchase the leased equipment is a case of first impression in this Circuit. The Sixth Circuit Court of Appeals has recently dealt with this issue. It ruled that:

> the most illustrative test to distinguish between a true lease and a lease intended as security is whether the "lessee" is "obligated to assent and pay for the property or [instead] is obligated only to return or account for the property according to the terms of the lease from which he may be excused if he exercises his privilege of purchasing it." [*United States Fidelity and Guaranty Company v. Thompson and Green Machinery Company, Inc.*, 568 S.W.2d 821, 825 (Tenn.1978)]. If the former is true, then the lease is a security instrument in a disguised sale; if the latter, then a true lease exists. *In re Celeryvale Transport, Inc.*, 822 F.2d 16, at 18 (6th Cir. 1987).

This Court adopts the reasoning of the Sixth Circuit and finds a "lease" that requires the "lessee" to purchase the property to be a security instrument disguised as a lease.

### Conclusion

■ When the question of true lease or security agreement arises, courts will use as an aid in evaluating an alleged lease, criteria such as the 16–part test of *Brookside Drug*. The objective is a determination of the intent of the parties at the time the agreement was entered into. Certain clauses in an alleged lease, which place substantially all the risks of ownership on the would-be lessee, will give rise to a

presumption that the lease was actually an attempt to secure a conditional sale. A clause obligating the lessee to purchase the leased equipment at the end of the lease term is a strong indication that the lease is a conditional sale. Similarly, a lease containing not only the other indica of ownership but, also, an acceleration clause that results in the lessee paying the acquisition cost plus earned interest, minus a certain percentage for early payment strongly indicates the lease is a security agreement. The purported lease before the Court contains all of these provisions and is a security agreement under all standards discussed in this opinion.