**In re NEMKO, INC., Debtor.**

**The CHASE MANHATTAN BANK, N.A., Plaintiff,**

v.

**NEMKO, INC., Summit Bank, Defendants.**

**Bankruptcy No. 90–11025–260.**
**Adversary No. 191–1110–260.**

United States Bankruptcy Court,
E.D. New York.

June 9, 1997.

See also 136 B.R. 342.

Winston & Strawn by Howard Seife, New York City, for Plaintiff Chase.

Lane & Mittendorf, L.L.P. by Christopher R. Belmonte, New York City, for Defendant/Summit Bank.

## MEMORANDUM OPINION

CONRAD B. DUBERSTEIN, Chief Judge.

Plaintiff, The Chase Manhattan Bank, N.A. ("Chase"), instituted the within adversary proceeding on March 11, 1991 against Defendant, Summit Bank ("Summit"), successor in interest to United Jersey Bank, and Debtor, Nemko, Inc. ("Nemko"), to determine the extent and validity of liens covering Nemko's accounts receivable. On April 15, 1991, Summit filed a motion to dismiss Chase's complaint pursuant to Federal Rule of Bankruptcy Procedure 7012(b) or in the alternative for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056. Chase filed a cross motion for summary judgment on October 18, 1991. On January 16, 1992, this court entered an order granting Summit's motion to dismiss and denying Chase's motion for summary judgment. Chase filed an appeal and on August 8, 1996, Judge Sterling Johnson of the United States District Court for the Eastern District of New York entered an order remanding this court's decision which had granted Summit's motion to dismiss, for the sole determination as to whether Nemko transferred its chief executive office from New Jersey to New York as that term is used in section 9–103(3)(d) of the Uniform Commercial Code. For the reasons stated below, Chase's motion for summary judgment is granted and Summit's motion for summary judgment is denied.

## FINDINGS OF FACT [1]

Nemko was incorporated pursuant to the laws of New Jersey in August 1984 by Dino Catozzo ("Catozzo") and his wife, Anna. Catozzo was originally designated President and Secretary of Nemko with Anna serving as Vice President and Treasurer. However, the two exchanged the positions of President and Vice President in September 1985. Though incorporated in August 1984, Nemko did not begin doing business until January 1, 1985 when it opened a "job shop" (similar to a temporary employment agency) for professional engineers. The Catozzos ran the job shop from their home located at 164 Konner Avenue, Pine Brook, New Jersey. Additional Nemko job shop offices were opened in Garden City and Jamaica, New York in July 1985.

In August of 1985, Nemko began work on rebuilding and overhauling 1,842 buses pursuant to a contract with General Motors Corporation, often referred to as "retrofit work." Nemko performed this work at a small facility on Stewart Avenue in Brooklyn, New York. Although entering into a new line of business, Nemko continued to operate the job shop though the importance of this aspect of its business steadily diminished over the next few years.

In an attempt to expand Nemko's retrofit business, Catozzo traveled to Tokyo, Japan in December 1985 to commence negotiations with a Japanese company, Toky-u Car Corporation. He sought to obtain a contract from Toky-u to complete final assembly of M4 railway cars which Toky-u u was under obligation to provide to Metro North Railroad.

Nemko was awarded the M–4 railway car contract in the early part of 1986. Because

---

1. The within discussion of findings of fact is brief as this court has previously enunciated its findings of fact to a substantial degree in its earlier opinion which granted the motion to dismiss and denied the cross motion for summary judgment. *Chase Manhattan Bank, N.A. v. Nemko, Inc. (In re Nemko, Inc.)*, 136 B.R. 334 (Bankr.E.D.N.Y. 1992), *aff'd in part, remanded in part*, 202 B.R. 673 (E.D.N.Y.1996). The court incorporates its earlier findings of fact and supplements them where necessary.

larger premises would be necessary to house the personnel and equipment needed to assemble the M–4 railway cars, Catozzo, with the help of Toky-u, immediately began the search for a new location. On August 1, 1986, Nemko entered into a lease with the Brooklyn Navy Yard Development Corporation to lease Building No. 296 at the Brooklyn Navy Yard located in Brooklyn, New York. Building No. 296 consisted of 144,000 square feet of warehouse space and 40,000 square feet of office space.

At the same time that it was expanding its retrofit operations, Nemko entered into a lease with the Catozzos to lease the first floor of a two story building owned by the Catozzos located at 346 Changebridge Road, Pine Brook, New Jersey. The leased space consisted of 2,000 square feet of office space. The basement and second floor of the building were leased to residential users. Nemko moved its New Jersey office to the leased premises thereby obviating the need for the Catozzos to operate the job shop from their home.

In order to raise the capital necessary to fund its expanding bus and railcar operations, Nemko entered into a revolving loan agreement with United Jersey Bank on April 8, 1986. Pursuant to the terms of the loan, Nemko entered into a security agreement with United Jersey Bank which granted United Jersey Bank a security interest in Nemko's inventory, equipment and accounts receivable. In exchange, United Jersey Bank agreed to lend Nemko an amount equal to 80% of Nemko's qualified accounts receivable. On April 16, 1986, United Jersey Bank filed financing statements with the New Jersey Secretary of State and the Morris County Clerk's Office thereby perfecting its security interest in Nemko's accounts receivable, inventory and equipment. The financing statements listed 164 Konner Avenue, Pine Brook, New Jersey as Nemko's address. Upon being informed of Nemko's move to the Changebridge Road location, United Jersey Bank filed amended financing statements reflecting 346 Changebridge Road, Pine Brook, New Jersey as Nemko's address.

Nemko's bus and railcar operations continued to grow and on January 17, 1987 Nemko entered into a contract with ANF, Inc., the United States subsidiary of ANF Industries of Paris, to perform final assembly of 200 railcars to be delivered to the New York Metropolitan Transit Authority. Despite the fact that Nemko had nearly completed converting Building No. 296 to a retrofit center, Nemko required additional space to perform its obligations under the ANF contract. On April 1, 1987 Nemko entered into a second lease with the Brooklyn Navy Yard Development Corporation to lease Building No. 664. Building No. 664 provided Nemko with an additional 58,900 square feet of warehouse space.

In 1988, Nemko entered into negotiations with the New York City Transit Authority ("NYCTA") to overhaul seventy five GMC RTS Advanced Design buses. The City approved Nemko's proposal on February 6, 1989, and Nemko was awarded the contract. Pursuant to the terms of the contract, the NYCTA was given an option to increase the number of buses to one hundred, which the NYCTA promptly exercised. Overhaul of the buses required still more improvements to Nemko's existing facilities at the Navy Yard including the installation of a paint booth, electrical work and the installation of a firewall and sprinkler system. In order to obtain funds for these improvements, Nemko sought financing from the Urban Development Corporation of New York State ("UDC") and the Financial Services Corporation of New York City ("FSC"). On May 16, 1989, the UDC informed Nemko that the New York State Public Authorities Control Board had approved Nemko's application for a $600,000.00 loan to be repaid over five years. Initial approval for a similar $300,-000.00 loan from the FSC was obtained on May 5, 1989.

Because closing on the government loans was not anticipated in the near future, Nemko had simultaneously been engaged in negotiations with Chase to obtain "bridge financing." Under the terms of an agreement reached with Chase, Chase agreed to loan Nemko $900,000.00 with payment due at the closing of the UDC and FSC loans. In connection with the "bridge" loan, Nemko executed two promissory notes payable to

Chase: one dated May 7, 1989 in the amount of $600,000.00 and the other dated May 11, 1989 in the amount of $300,000.00. In addition, Nemko executed a security agreement and granted Chase a security interest in Nemko's equipment, inventory and accounts receivable. United Jersey Bank was an active participant in Nemko's negotiations with Chase and acquiesced to Chase's demand that United Jersey Bank subordinate its security interest in Nemko's equipment and inventory. As a result, United Jersey Bank retained a first priority position over Chase only in regard to Nemko's accounts receivable. In February 1990, Chase renewed its commitment to Nemko and in turn Nemko executed two new promissory notes in the same amounts to replace those of May 7, 1989 and May 11, 1989.

While performing its obligations under the NYCTA contract, a dispute arose between Nemko and one of its subcontractors, Transportation Manufacturing Corporation ("TMC"). The dispute led to a lawsuit between the two with Nemko asserting a breach of contract claim against TMC in the amount of $1,800,000.00 and TMC asserting a counterclaim in the amount of $900,000.00. On March 15, 1990, TMC filed suit against the NYCTA seeking a temporary restraining order to prohibit the NYCTA from releasing any funds due Nemko under the contract pending the resolution of TMC's dispute with Nemko. The NYCTA complied with TMC's request and withheld funds owing to Nemko under the contract. As a result, Nemko was forced to seek additional funds to pay its expenses.

Nemko filed a chapter 11 petition on March 19, 1990. Due to the NYCTA's withholding of the funds due Nemko under the contract, Nemko was no longer able to pay its debts as they matured, pay the salaries of its employees and purchase the parts necessary to complete the NYCTA contract. Under such circumstances, the UDC and the FSC were unwilling to close on their loans. As a result, at the time of the filing of its bankruptcy petition, Nemko was indebted to Chase in the principal amount of $900,000.00. Nemko was also indebted to United Jersey Bank in the amount of $1,895,922.00.

On April 19, 1990, United Jersey Bank filed an application by order to show cause together with a temporary restraining order to prohibit Nemko from using United Jersey Bank's cash collateral consisting of proceeds derived from accounts receivable on which United Jersey Bank held a lien. Nemko filed a sworn affidavit of Catozzo dated April 19, 1990 in opposition. The affidavit did not dispute the validity of United Jersey Bank's lien on Nemko's accounts receivable but instead asked the court for authority to use $450,000.00 of United Jersey Bank's cash collateral which Nemko needed in order to complete the overhaul of eleven buses remaining under the NYCTA contract.

Counsel to United Jersey Bank, Nemko and Chase were present when the application was presented to the court as a result of which a hearing was conducted to determine whether the court should enter the order to show cause. Despite the affidavit of Catozzo which it had presented to the court, Nemko now opposed United Jersey Bank's application by questioning the perfection of United Jersey Bank's security interest in Nemko's accounts receivable. Counsel to Nemko asserted that once Nemko's retrofit operations at the Brooklyn Navy Yard became operational, there was an effective transfer of Nemko's chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard in Brooklyn, New York. Thus, Nemko's counsel argued, the perfection of United Jersey Bank's security interest in Nemko's accounts receivable lapsed due to United Jersey Bank's failure to file a financing statement in New York as required by section 9–103(3)(e) of the Uniform Commercial Code. Chase did not take a position regarding Nemko's assertion but did argue that if Nemko was authorized to use cash collateral, Chase was entitled to adequate protection based on its own secondary security interest in Nemko's accounts receivable. Nemko did not dispute the validity of Chase's perfected security interest. After hearing argument from all of the parties involved, this court entered the order to show cause and ordered Nemko to appear on April 27, 1990 and show cause why Nemko should not be prohibited from using cash

collateral and further requiring Nemko to provide a full and complete accounting of its prepetition accounts receivable. Pending the April 27, 1990 hearing, the court authorized Nemko to use $15,000.00 of the banks' cash collateral.

Prior to the hearing (which had been adjourned on consent of the parties to April 30, 1990), Nemko filed a second sworn affidavit of Catozzo in opposition to United Jersey Bank's application. In this second affidavit, dated April 26, 1990, Nemko continued to advocate the position that it had first raised at the April 19, 1990 hearing; namely that by the close of 1988, Nemko had effectively transferred its chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to Buildings No. 296 and No. 664 at the Brooklyn Navy Yard in Brooklyn, New York. Catozzo also asserted that United Jersey Bank had been fully aware of the move and had in fact consented to it. Nemko also filed a sworn affidavit of Anna Catozzo dated April 26, 1990. Consistent with her husband, Anna also took the position that Nemko had transferred its chief executive office from New Jersey to New York and therefore United Jersey Bank's lien was unperfected due to the fact that United Jersey Bank had not filed a financing statement in New York.

In response to the Catozzos' affidavits, United Jersey Bank filed a "Memorandum of Law to Establish Security Interest" on April 30, 1990. The memorandum disputed Nemko's contention that Nemko had transferred its chief executive office by citing numerous facts which demonstrated that Nemko used the Brooklyn Navy Yard solely as an engineering facility while its office at 346 Changebridge Road, Pine Brook, New Jersey continued to function as its headquarters.

Prior to the hearing on the order to show cause on April 30, 1990, an agreement was reached between Nemko, United Jersey Bank and Chase which the court later "so ordered" on the record at the hearing. Under the agreement, the banks authorized Nemko to immediately use $50,000.00 of their cash collateral, with use of additional cash collateral to be determined at a future hearing. After several subsequent hearings, this court entered an order on July 12, 1991 directing the NYCTA to pay to Nemko $529,-537.00 as an advance on the eleven buses remaining under the contract. In exchange for their consent to Nemko's use of the banks' cash collateral to finish the buses, the banks were given post petition liens on all of Nemko's property. The issue of which bank's lien had priority in regard to Nemko's accounts receivable was left open with the parties directed to file an appropriate action to bring the issue before the court.

On July 27, 1990, United Jersey Bank filed a motion to determine the validity of its lien. At the hearing on the motion, Nemko abandoned its previous position that it had transferred its chief executive office and recognized the first priority position of United Jersey Bank's lien. United Jersey Bank then sought to withdraw its motion. The court allowed United Jersey Bank to withdraw the motion without prejudice to other parties to question the status of United Jersey Bank's lien.

On February 27, 1991, Nemko and United Jersey Bank filed a joint application to modify this court's July 12, 1990 order and to grant United Jersey Bank relief from the automatic stay. The application sought court recognition of the fact that United Jersey Bank held a first priority lien on Nemko's accounts receivable. It also requested authorization for Nemko, once it had possession of the funds, to turn over to United Jersey Bank the receivable which would be due and owing from the NYCTA upon Nemko's completion of the bus contract (approximately $850,000.00). Before a hearing on the application could be held, however, Chase filed a complaint against Nemko and United Jersey Bank to determine the extent and validity of United Jersey Bank's lien on Nemko's accounts receivable. The complaint adopted Nemko's prior position that Nemko had transferred its chief executive office from New Jersey to the Brooklyn Navy Yard and therefore the perfection of United Jersey Bank's security interest had lapsed due to United Jersey Bank's failure to file a financing statement in New York. Chase also filed opposition to Nemko and United Jersey Bank's February 27, 1991 application arguing that until the adversary proceeding was re-

solved and the priority of United Jersey Bank's lien determined, it was premature to grant United Jersey Bank relief from the automatic stay.

On April 15, 1991, United Jersey Bank filed a motion to dismiss Chase's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] United Jersey Bank argued that because Chase was fully aware of United Jersey Bank's prior financing statements when it entered into the security agreement with Nemko in May 1989 (as evidenced by Chase's request that United Jersey Bank subordinate its security interest in Nemko's accounts receivable to that of Chase), Chase lacked standing pursuant to section 9401(2) of the Uniform Commercial Code to assert the priority of its security interest. Section 9401(2) provides that the filing of a financing statement which is made in good faith but in an improper location is nevertheless effective against anyone with knowledge of the filing. In the alternative, United Jersey Bank requested that it be granted summary judgment pursuant to Federal Rule of Civil Procedure 56[3] on the issue of whether Nemko had transferred its chief executive office from New Jersey to New York. The motion was supported by yet a third affidavit of Catozzo along with affidavits of Calvin Navatto, an officer of United Jersey Bank, and Christopher R. Belmonte, counsel to United Jersey Bank. Catozzo now recanted his prior testimony, stating that after a review of United Jersey Bank's trial evidence it was apparent to him that Nemko's chief executive office had at all times remained in New Jersey. As a final request for relief, United Jersey Bank asked the court to impose sanctions against Chase and its counsel pursuant to Federal Rule of Bankruptcy Procedure 9011 and Federal Rule of Civil Procedure 11. United Jersey Bank argued that sanctions were warranted because Chase was, for the most part, relying on the position asserted by the Catozzos in their April 26, 1990 affidavits, a position which Nemko had since abandoned.

Chase responded to United Jersey Bank's motion by filing opposition on May 13, 1991. The opposition was supported by an affidavit of Andrew I. Ryan, a Vice President of Chase, who denied that Chase lacked standing to file the complaint. Chase argued that section 9–401(2) applied only to those circumstances where a senior creditor had filed a financing statement in the wrong location and did not apply to a situation where a senior creditor had allowed the perfection of its security interest to lapse by operation of the Uniform Commercial Code.

Following discovery, Chase filed its own motion for summary judgment on October 18, 1991. The motion relied heavily on a deposition of Catozzo taken on August 15 and 19, 1991 and the April 26, 1990 affidavits of Dino and Anna Catozzo. It requested that the court grant Chase summary judgment on the issue of whether Nemko transferred its chief executive office to Brooklyn. On November 5, 1991, United Jersey Bank filed a memorandum of law in opposition to Chase's motion for summary judgment. The memorandum reiterated the points previously raised in United Jersey Bank's motion to dismiss.

On January 15, 1992, this court issued an opinion granting United Jersey Bank's motion to dismiss Chase's complaint and denying Chase's motion for summary judgment. The court rejected Chase's strict interpretation of section 9–401(2), instead finding that even if Nemko had transferred its chief executive from New Jersey to New York, the protections afforded by section 9–401(2) were broad enough to protect a creditor such as United Jersey Bank. The court found that based on the subordination agreement between United Jersey Bank and Chase, Chase was fully aware of United Jersey Bank's prior filing when it entered into its security agreement with Nemko. Because there was no evidence that United Jersey Bank's failure to file a financing statement in New York was due to bad faith (assuming, of course, that filing such a financing statement was necessary), section 9–401(2) preserved the

---

**2.** Federal Rule of Civil Procedure 12(b)(6) is applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7012(b).

**3.** Federal Rule of Civil Procedure 56 is applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056.

priority of United Jersey Bank's security interest. Chase filed a notice of appeal of the court's decision on January 27, 1992.

In a separate opinion issued January 31, 1992, the court denied United Jersey Bank's motion for sanctions against Chase and its counsel. The court found that Chase had sufficient evidence to form a reasonable basis upon which to file its complaint, therefore the court could not find that the complaint was frivolous or filed in bad faith. United Jersey Bank filed a notice of appeal from that decision.

In the meantime, Nemko had delivered the buses remaining under the NYCTA contract to the NYCTA, thereby fulfilling its obligations under the contract. The NYCTA deposited $738,629.00 [4] into an escrow interest bearing account pending court direction as to who was entitled to the funds. Besides Chase's claim, several subcontractors also claimed entitlement to the funds. The subcontractors argued that pursuant to the terms of the NYCTA contract, all subcontractor claims had to be resolved and paid before the NYCTA could turn over any funds to Nemko. Because subcontractor claims existed, any funds owed by the NYCTA under the contract belonged to the subcontractors and were not property of the estate under 11 U.S.C. § 541(a).

In an opinion issued August 25, 1992, this court rejected the subcontractors' argument and found that any amount owed by the NYCTA to Nemko under the contract was property of the estate pursuant to § 541. Nemko and the NYCTA agreed that at a minimum, $738,629.00 was due Nemko under the contract with an additional $108,911.00 in dispute. Because Chase had not sought a stay pending appeal of this court's January 15, 1992 decision, the court refused Chase's request that the NYCTA be prohibited from turning over this amount to Nemko for United Jersey Bank's benefit until a decision on its appeal was rendered. The court did, however, authorize the NYCTA to withhold from paying Nemko $329,671.00 out of this amount pending the resolution of one of the subcontractors' claims.

Nearly two years later, on June 23, 1994, Nemko's bankruptcy case was dismissed because of its inability to pursue a reorganization in chapter 11. Subsequent to the dismissal, as has been previously noted, the District Court rendered its decision affirming this court's decision denying United Jersey Bank's request for sanctions and remanding United Jersey Bank's motion to dismiss Chase's complaint back to this court for further consideration. The District Court held that section 9401(2) of the Uniform Commercial Code protects only those senior creditors who misfile an initial financing statement by filing in the wrong location and that section 9401(2) is not intended to protect creditors who allow the perfection of their security interest to lapse under section 9-103(3)(e). Since the priority of United Jersey Bank's lien is not preserved under section 9-401(2), the issue of which bank's security interest has priority now depends solely on whether Nemko transferred its chief executive office from New Jersey to New York. Though Chase urged the District Court to resolve this issue as a matter of law, the District Court refused to do so, instead remanding the issue to this court for determination.

Following the District Court's decision, a hearing was held in this court on September 17, 1996. Counsel to United Jersey Bank informed the court that its claim had since been transferred to Summit Bank, which is now the proper party in interest. Both parties agreed that an evidentiary hearing was not required and that the case should be submitted to this court for a final resolution on the submission of briefs. The court will therefore dispense with the standards applicable to motions for summary judgment under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 and will consider the matter as if a trial on the merits had been conducted.

Though maintaining the position of its predecessor that Nemko did not transfer its

---

4. This is the amount the NYCTA alleged that it owed Nemko upon completion of the contract. Nemko disputed a $108,911.00 reduction taken by the NYCTA for liquidated damages and warranty claims. Thus, Nemko placed the amount due and owing anywhere from $738,629.00 to $847,540.00.

chief executive office from New Jersey to New York, Summit suggested in a letter to this court dated April 11, 1997 that it revisit its prior opinion notwithstanding the fact that this decision was considered and ruled on by Judge Johnson when he remanded the decision back to this court. More specifically, Summit contends that a recent Appellate Division, First Department case, *P.T. Bank Cent. Asia v. Chinese Am. Bank*, 229 A.D.2d 224, 654 N.Y.S.2d 117 (1997) provides additional authority for this court's prior holding that when a junior creditor has notice of a prior misfiled financing statement, the protections afforded to a senior creditor by section 9–401(2) should be construed broadly and not be limited to only those situations where a senior creditor has filed its initial financing statement in the wrong location in a dual filing jurisdiction.

In *P.T. Bank Cent. Asia*, the First Department found that section 9–401(2) was broad enough to protect not only those creditors who misfiled their initial financing statement by filing in the wrong location, but also those creditors who misfile a continuation statement as required by section 9–403 (assuming, of course, that the junior creditor had notice of the initial properly perfected financing statement). *P. T. Bank Cent. Asia*, 654 N.Y.S.2d at 118. Summit argues that the facts in *P. T. Bank Cent. Asia* are analogous to the facts in this case and therefore, because Chase had notice of United Jersey Bank's initial filing in New Jersey, Summit should not have its security interest subordinated to that of Chase in the event this court finds that Nemko transferred its chief executive office from New Jersey to New York.

The court disagrees with Summit's argument that *P.T. Bank Cent. Asia* is sufficiently analogous to govern the case at hand. On the contrary, *P.T. Bank Cent. Asia* is clearly distinguishable. *P.T. Bank Cent. Asia* concerned a situation where a senior creditor, Chinese American Bank, allowed the perfection of its security interest to lapse in one of the two required locations for filing in a dual filing jurisdiction by failing to file a timely continuation statement in one of the two locations. *P.T. Bank Cent. Asia*, at 119. Prior to the litigation, Chinese American Bank had consistently filed continuation statements in a timely manner with the New York Department of State. However, in 1981, it allowed its local filing to lapse when it filed a continuation statement with the New York City Registrar three weeks after the deadline. *Id.* As with the case presently before us, it was not disputed that the junior creditor, P.T. Bank Central Asia, had notice of Chinese American Bank's initial filings with the Department of State and the City Registrar. In concluding that section 9401(2) should be construed broadly enough to protect the priority of Chinese American Bank's security interest, the First Department relied heavily on the fact that, at all times, the security interest of Chinese American Bank remained properly perfected in the office of the Department of State. *Id.*, 654 N.Y.S.2d at 118, 121–23. In other words, Chinese American Bank's failure to timely file a continuation statement with the City Registrar resulted in only a partial lapse of the perfection of its security interest. The First Department reasoned that because a dual filing jurisdiction requires potential creditors to look in two locations for prior filings, a junior creditor is not prejudiced by affording such protection to a senior creditor since the junior creditor can be expected to find the filing which remains properly perfected. *Id.* at 122.

In the instant case before this court, however, no such second filing will be deemed to exist in the event the court finds that Nemko transferred its chief executive office from New Jersey to New York. Such a finding would result in a total lapse of the perfection of Summit's security interest under section 9–103(3)(e) as Summit admits that neither it or United Jersey Bank took any action to perfect its security interest in New York. Thus, a potential creditor who searched for a prior filing in New York would not be on notice of Summit's prior security interest in Nemko's accounts receivable. Nothing in *P. T Bank Cent. Asia* suggests that the First Department would construe section 9–401(2) to protect a senior creditor who allowed its security interest to fully lapse under section 9–103(3)(e). Unlike a situation where there has been only a partial lapse and one filing remains perfected, it is unreasonable to as-

sume that a potential creditor will find a formerly perfected interest of a senior creditor when the interest of the senior creditor has fully lapsed. Thus, there is no justification for extending the protections found in section 9–401(2) to a senior creditor who has allowed its security interest to fully lapse. The First Department was careful to limit its decision to only those instances where one of two filings had lapsed in a dual filing jurisdiction. *Id.* at 121 ("[T]he matter on appeal is unusual in two significant respects: 1) the interest of the senior creditor lapsed in only one of the two locations where it was required to be recorded.... "). Because the present case may involve the total lapse of the perfection of Summit's security interest, the court does not find *P. T Bank Cent. Asia* persuasive and therefore will address only that issue contemplated in Judge Johnson's remand order.

### DISCUSSION

This case concerns the dispute between Summit Bank and Chase Manhattan Bank as to which bank's security interest in Nemko's accounts receivable has priority. Each bank claims to have first priority to the account receivable that was due Nemko upon its completion of the NYCTA contract.[5]

When a debtor operates its business in more than one state, perfection of a security interest in that debtor's accounts receivable is governed by section 9–103(3) of the Uniform Commercial Code. *See* N.J.REV.STAT. § 12A:9–103(3) (Supp.1996); N.Y.U.C.C.LAW § 9–103(3) (McKinney 1990). Section 9–103(3)(b) states that "[t]he law ... of the

jurisdiction where the debtor is located governs the perfection and the effect of perfection or non-perfection of the security interest." N.J.REV.STAT. § 12A:9–103(3)(a) (Supp. 1996); N.Y.U.C.C.LAW § 9–103(b) (McKinney 1990). For purposes of section 9–103(3)(b), a debtor is deemed located at his "place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." N.J.REV.STAT. § 12A:9–103(3)(d) (Supp.1996); N.Y.U.C.C.LAW § 9–103(d) (McKinney 1990). The record is clear that since Nemko first opened its Garden City office in New York in 1985, Nemko has had more than one place of business. Therefore, Nemko's location for purposes of section 9–103(3)(b) has depended on the location of its chief executive office. Nor is it disputed that when United Jersey Bank filed its amended financing statements in New Jersey in 1986, Nemko's chief executive office was located at 346 Changebridge Road, Pine Brook, New Jersey and that United Jersey Bank's security interest was properly perfected.[6]

Instead Chase argues that United Jersey Bank allowed the perfection of its security interest to lapse by failing to preserve the priority of its security interest in Nemko's accounts receivable in New York following the transfer of Nemko's chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard in 1988. Pursuant to section 9–103(3)(e) of the Uniform Commercial Code, a security interest in accounts receivable perfected in the jurisdiction where the debtor is located remains perfected for four months

---

5. As stated previously, Nemko and the NYCTA agreed that the account receivable was at least $738,629.00 with an additional $108,911.00 in dispute. Accordingly, the court authorized the NYCTA to pay Nemko $738,629.00 minus $329,-761.00 pending resolution of subcontractor claims. It is not clear from the record, however, if a final amount for the account receivable was ever established or what amount, if any, the NYCTA actually paid to Nemko and what amount Nemko may have subsequently paid over to United Jersey Bank. Chase claims that Nemko made two payments to United Jersey Bank; the first for § 363,181.00 on October 28, 1992 and the second for $286,075.00 on November 18, 1992, however, no evidence of these payments is provided. (*See* Mem. on Remand in Support of The

Chase Manhattan Bank N.A.'s Cross Mot. for Summ. J., at 25). Accordingly, this court will not make a determination as to a final figure for the account receivable. Any dispute over the amount must be determined at a later evidentiary hearing.

6. The fact that Chase does not dispute that Nemko's chief executive office was originally in New Jersey is derived from its characterization of the issue of the case. Chase phrases the issue as whether "Nemko relocate[d] its chief executive office from New Jersey to New York in 1988?" (*See* Memorandum on Remand in Support of the Chase Manhattan Bank N.A.'s Cross–Motion for Summary Judgment, at 2).

following the debtor's relocation to another jurisdiction. N.J.Rev.Stat. § 12A:9–103(3)(e) (Supp.1996); N.Y. U.C.C. Law § 9–103(3)(e) (McKinney 1990). If the secured creditor does not reperfect its interest in the jurisdiction of the debtor's new location within the four month period, perfection of the creditor's security interest ceases. *See Konkel v. Golden Plains Credit Union,* 778 P.2d 660, 665 (Colo.1989) (citations omitted). Summit agrees that, if in fact Nemko did move its chief executive office from New Jersey to New York in 1988, perfection of its security interest lapsed as neither it or its predecessor, United Jersey Bank, has taken any steps to perfect its security interest in New York. However, Summit strongly disputes Chase's contention that Nemko transferred its chief executive office from New Jersey to New York. Because Nemko's chief executive office was at all times in New Jersey, Summit argues that section 9–103(3)(e) does not apply and therefore its security interest retains its first priority position. Thus the sole issue before the court is whether Nemko transferred its chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard, Brooklyn, New York in 1988.[7]

*A. Legal Standard*

The Uniform Commercial Code does not define the phrase "chief executive office." Therefore it is not surprising that most, if not all, of the courts that have been faced with the task of determining the location of a debtor's chief executive office have relied heavily on the definition of chief executive office found in the Official Comment to the U.C.C. *See Jarboe v. United Bank (In re Golf Course Builders Leasing, Inc.),* 768 F.2d 1167, 1170 (10th Cir.1985); *Aoki v. Shepherd Mach. Co. (In re Thompson),* 665 F.2d 941, 949 (9th Cir.1982). The Official Comment states in pertinent part that:

> [c]hief executive office does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. This is the place where persons dealing with the debtor would normally look for credit information, and is the appropriate place for filing. The term 'chief executive office' is not defined in the Section or elsewhere in this Act. Doubt may arise as to which is the 'chief executive office' of a multi-state enterprise, but it would be rare that there could be more than two possibilities.

U.C.C. § 9–103(3)(d) cmt. 5(c) (1972). Using the Comment as a guide, courts developed a two-fold inquiry to determine the location of a debtor's chief executive office. First, from where does the debtor manage the main part of its business and second, what are the reasonable expectations of creditors? *See Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3rd Cir.1991), *cert. denied sub nom., Committee of Unsecured Creditors v. Mellon Bank, N.A.,* 503

---

7. It is not clear from the language of section 9–103(3) or the relevant case law whether the court should apply the law of New Jersey (the agreed upon original location of Nemko's chief executive office) or that of New York (the location to which Chase alleges Nemko relocated) to make its determination as to the location of Nemko's chief executive office. Up to this point, the court has cited the relevant statutes of both jurisdictions. In *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3rd Cir.1991), *cert. denied sub nom., Committee of Unsecured Creditors v. Mellon Bank, N.A.,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992), a leading case on section 9–103(3)(d) which will be discussed in detail below, the Third Circuit Court of Appeals was faced with the task of determining at what point in time a debtor had transferred its chief executive office from Rockville, Maryland to Pittsburgh, Pennsylvania. The court phrased the issue as one arising under section 9–103, citing only Pennsylvania's version of the Uniform

Commercial Code. No mention of Maryland law was made. Thus, there is authority for holding that it is the law of the state to which a debtor is alleged to have moved that governs the court's determination concerning the location of that debtor's chief executive office. Therefore, the court will apply New York law in making its determination as to whether Nemko transferred its chief executive office from New Jersey to New York.

In this case, however, this may be a distinction without a difference as the law would appear to be the same in either jurisdiction. New York and New Jersey have identical versions of section 9–103(3), each state having adopted section 9–103 of the Uniform Commercial Code as amended in 1972. Nor is there case law in either jurisdiction defining the term "chief executive office." Thus, it is likely the court would reach the same result applying the law of either jurisdiction.

U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170; *In re Thompson,* 665 F.2d at 949.

The first inquiry stems from the Comment's use of the phrase "manages the main part of his business operations." Courts adopting the two-fold inquiry have held that what the drafters of the U.C.C. intended by the phrase is the location where the debtor manages all of its business operations, otherwise referred to as the debtor's centralized management or its headquarters. By associating chief executive office with a debtor's headquarters, these courts reject the idea that chief executive office refers only to that location which manages the debtor's largest business volume. *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170; *In re Thompson,* 665 F.2d at 949–50; *Yoppolo v. Ohio Citizens Bank (In re A.J. Gibbons Roofing and Sheet Metal, Inc.),* 139 B.R. 654, 657 (Bankr.N.D.Ohio 1991) (holding that business volume is not the *sine qua non* for determining chief executive office); *In re Astrocade, Inc.,* 31 B.R. 245, 249–51 (Bankr. S.D.Ohio 1983) (same). The rationale for this interpretation is based in large part on the 1972 amendment to section 9–103. Prior to 1972, "the law ... of the jurisdiction where [debtor's] chief place of business is located" governed the validity and perfection of a security interest in debtor's general intangibles and goods of the type which are normally used in more than one jurisdiction. *See In re Thompson,* 665 F.2d at 949. Among other things, the 1972 amendment to the U.C.C. replaced the phrase "chief place of business" with "chief executive office." [8] Courts such as *Golf Course* and *Thompson* interpreted this amendment as an indication of the drafters' intent to require a test which focuses on a debtor's management instead of that debtor's business operations. *In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170; *In re Thompson,* 665 F.2d at 950; *but see Riverdale Bank v. Dubois (In re Bugos),* 34 B.R. 382, 384 (N.D.Ind.1983) (stating that even though section 9–103 was completely rewritten in 1972, most of the changes were

formal and not substantive, thus "the general rule—that the law of the debtor's chief place of business governs the perfection of a security interest—is basically the same under either version."). It is argued that such a test fosters stability in that the location of a debtor's centralized management is relatively permanent whereas the location of a debtor's largest business volume is often volatile and subject to change. *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170; *In re Thompson,* 665 F.2d at 950.

The second inquiry under the two-fold test concerns the reasonable expectations that creditors of the debtor may have in regard to the location of a debtor's chief executive office. Based on that part of the Comment which states "[chief executive office] is the place where persons dealing with the debtor would normally look for credit information," the inquiry requires the court to examine the expectations of a representative number of creditors of the debtor and not just those creditors who deal with the debtor's largest business volume. *See In re Thompson,* 665 F.2d at 950; *In re Astrocade, Inc.,* 31 B.R. at 249.

■ The two-fold inquiry developed through cases such as *Golf Course* and *Thompson* remained predominant until 1991 when the Third Circuit Court of Appeals issued its opinion in *Mellon Bank, N.A. v. Metro Communications, Inc.,* reported at 945 F.2d 635 (3rd Cir.1991). In *Mellon,* the Third Circuit agreed that the definition of chief executive office provided in the Official Comment was the correct one, but greatly criticized the approach taken by the courts in *Golf Course* and *Thompson* to apply that definition. The *Mellon* court characterized the two-fold inquiry as mechanistic and rigid, favoring instead a more simplistic approach, asking only " 'where does the debtor manage the main part of its business' because that is where creditors are likely to search for information." *Id.* at 642. Though many of the same factors that are to be considered under the two-part inquiry of *Golf Course* and

---

8. The 1972 amendment also added accounts to the list of intangible collateral governed by section 9–103(3).

*Thompson* will also be considered under the *Mellon* approach, there is one important difference. Under *Mellon,* a court must first determine the "main part" of a debtor's business; the "main part" of business being analogous to debtor's largest business volume, a factor largely discounted by the courts in *Golf Course* and *Thompson.*[9] Once the "main part" of a debtor's business is determined, the place from which the debtor manages the "main part" of its business is determinative of the debtor's chief executive office. The distinction is of critical importance in this case as there is overwhelming evidence that following 1987, Nemko generated nearly all of its revenue and therefore its greatest business volume from its bus and railway car operations at the Brooklyn Navy Yard.

This court favors the approach adopted by the Third Circuit in *Mellon* for determining the location of a debtor's chief executive office under section 9–103(3)(d). As stated, this approach requires a court to consider many of the same factors that would normally be considered under the *Golf Course* and *Thompson* analysis. By concluding, however, that it is where a debtor manages the "main part" of its business that the debtor's creditors will look to find credit information, the *Mellon* approach does not require the court to compartmentalize each piece of evidence into one of the two inquiries. The court is free to evaluate the evidence from an overall perspective. Lastly, and perhaps most importantly, the approach adopted in *Mellon* allows a court to consider the location of a debtor's largest business volume. By requiring a court to first determine the "main part" of a debtor's business and then determine the location from which the "main part" of that debtor's business is managed, meaning and substance is given to the phrase "the *main part* of his business operations." U.C.C. § 9–103(3)(d) cmt. 5(c) (1972) (empha-

sis added). By equating chief executive office with a debtor's centralized headquarters, the *Golf Course* and *Thompson* courts had effectively read this phrase out of the Comment.

## B. Nemko's Operations at the Brooklyn Navy Yard

■■■ Though Nemko also operated a "job shop" for professional engineers, it is clear that by 1987, the "main part" of Nemko's business was repairing, overhauling, remanufacturing, retrofitting, and assembling buses and railway cars. This is evidenced by the fact that in 1987, Nemko generated approximately $10.4 million from its retrofit operations in Brooklyn, and only $5.4 million from its "job shop" activities in the New Jersey and Garden City offices. By 1988 this disparity had grown to $12.9 million being generated from the Brooklyn location and only $2.2 million from Garden City (no revenue was generated from the New Jersey office after 1987). During this time, Nemko had 450 employees working at its Brooklyn location while less than a dozen staffed the New Jersey office. An April 20, 1990 Dun & Bradstreet report stated that by August 1, 1989, sixty five percent of Nemko's operations concerned manufacturing train cars and equipment and only twenty five percent concerned the operation of the job shop. Further evidence that the Brooklyn Navy Yard played a sizeable role in Nemko's operations is the fact that from 1987 up to the time it filed its chapter 11 petition, Nemko invested over $4,500,000.00 to convert Building Nos. 296 and 664 into a bus and railway car retrofit center. This conversion resulted in 202,900 square feet of plant/warehouse space and 40,000 square feet of office space. In comparison, Nemko's New Jersey office consisted of 2,000 square feet of office space.[10]

9. As stated earlier, the courts in *Golf Course* and *Thompson* equated a debtor's chief executive office with the location where the debtor managed *all* of its business. *In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170; *In re Thompson,* 665 F.2d at 949–50. The *Mellon* court rejected this contention, explicitly stating that the location of any facet of a debtor's business that was not part of the "main part" of that debtor's business was "secondary" and was not determi-

native of the debtor's chief executive office. *Mellon Bank, N.A.,* 945 F.2d at 643 n. 1.

10. Much of the evidence concerning Nemko's retrofit operations in Brooklyn is derived from the April 26, 1990 affidavits of Dino and Anna Catozzo and the August 1991 deposition testimony of Dino Catozzo. As stated, Nemko submitted the affidavits in support of its opposition to United Jersey Bank's April 19, 1990 application to

Having determined that the "main part" of Nemko's business was its retrofit operations in Brooklyn, the court must now determine where that business was managed from for that is where Nemko's creditors would have been expected to search for credit information. One factor consistently looked to by the courts to determine where the main part of a debtor's business is managed is to consider where the offices of the debtor's principal and officers are located, i.e., where are the principal and officers physically located? *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1171; *In re Astrocade,* 31 B.R. 245 at 250.

Originally, each of Nemko's officers were assigned to the New Jersey office located at 346 Changebridge Road, Pine Brook, New Jersey. However, as Nemko's retrofit operations grew, most of Nemko's officers gradually moved their offices to the renovated facilities at the Brooklyn Navy Yard. Most important of these officers was Dino Catozzo. Though his wife Anna was president and sole shareholder of Nemko, the record is clear that Catozzo was a pivotal, if not sole decision maker for Nemko and as such must be considered a principal of Nemko. The physical location of a debtor's principal is extremely important in making a determination as to the location of a debtor's chief executive office and nearly every court facing the issue has looked to this factor. *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1171; *Hunter v. Society Bank & Trust (In re Parker Steel Co.),* 149 B.R. 834, 848 (Bankr. N.D.Ohio 1992); *In re A.J. Gibbons Roofing and Sheet Metal, Inc.,* 139 B.R. at 657; *Devine v. Swartz (In re Swartz),* 62 B.R. 88, 90 (Bankr.D.Neb.1986); *Chase Manhattan Bank, N.A. v. Ramco Well Serv., Inc. (In re Ramco Well Serv., Inc.),* 32 B.R. 525, 527 (Bankr.W.D.Okla.1983); *In re Astrocade,* 31 B.R. at 250. Catozzo testified that in 1988 he spent two thirds of his time at the Navy Yard. By 1989, he was spending seventy five percent of his time at the Brooklyn Navy Yard and only twenty five percent of his time at the Changebridge Road office. The fact that Catozzo, a principal of Nemko, spent such a large majority of his time at the Brooklyn Navy Yard as opposed to the New

prevent Nemko from using cash collateral. Besides containing factual information concerning Nemko's business operations, the affidavits also included the Catozzos' opinion that Nemko had transferred its chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard in 1988.

The August 1991 deposition of Catozzo took place nearly a year after the hearing on United Jersey Bank's motion to determine the extent and validity of its lien at which Nemko publicly abandoned its prior position and recognized the validity and first priority status of United Jersey Bank's lien. In is therefore not surprising that at his deposition, Catozzo, often relying on facts not discussed in the April 26, 1990 affidavits, adamantly denied that Nemko had transferred its chief executive office to Brooklyn.

For the most part, though they reach opposing conclusions, the April 26, 1990 affidavits of Dino and Anna Catozzo do not contradict factually with Dino Catozzo's August 1991 deposition testimony. One exception, however, concerns Anna Catozzo's involvement in the management of Nemko. In his April 26, 1990 affidavit, Catozzo described his wife's role as that of a part time assistant, stating that "[w]hile Anna Catozzo is the President and sole shareholder of Nemko, it is I who actually created and operates Nemko." (Dino Catozzo Apr. 26, 1990 aff ¶ 25). Anna's affidavit is consistent with this assertion, stating that:

[P]rior to Nemko's inception, continuing to the present, the company has been operated by my husband, Dino Catozzo, Vice President of Marketing and Sales. While I hold the title of President, I do not have, nor have I ever exercised, any authority over day-to-day operations or decisions concerning the operation of the Debtor's business or its finances. Essentially, I am President in name only. All decisions are made in Brooklyn by my husband Dino Catozzo. (Anna Catozzo Apr. 26, 1990 aff. ¶ 6). Catozzo's deposition testimony a year later paints an entirely different picture of Anna's role. Catozzo testified in 1991 that not only did Anna work in her New Jersey office full time, but she shared total responsibility for operating and managing Nemko with Dino and all final decisions were made equally between them. (Dino Catozzo Aug. 15, 1991 Dep. at 20, 23).

The glaring contradiction between the April 1990 affidavits and Catozzo's deposition testimony renders the credibility of each highly suspect. Both Summit and Chase, however, rely heavily on this evidence. For this reason, the court will not entirely discount this evidence. The court will consider only those factual allegations contained in the affidavits and the deposition testimony which are uncontradicted. The Catozzos' opinion concerning the location of Nemko's chief executive office and any factual allegations concerning Anna Catozzo's role in the management of Nemko will not be considered.

Jersey office strongly supports a finding that by 1989, Nemko was managing its bus and railcar retrofit operations from the Brooklyn Navy Yard.

Along with Catozzo, most of Nemko's other key officers also made the move from 346 Changebridge Road to the Brooklyn Navy Yard. For example, Thomas Bielecki, Vice President of Corporate Finance moved his office to Brooklyn in 1988. His duties involved handling the "day to day estimating, local manufacturing, cost accounting, computer enhancement and a little bit of everything." Similarly, Daniel Walits, Vice President of Human Resources was reassigned from New Jersey to Brooklyn in 1988. Most important of his duties was recruiting the personnel necessary to complete Nemko's contracts with Toky–U and ANF Inc.

In addition to those officers who were transferred from New Jersey to Brooklyn, Nemko hired numerous new officers to work at the Navy Yard in its effort to complete its contractual obligations on time. These new officers were responsible for overseeing many of the vital operations at the Brooklyn Navy Yard including engineering and product development, bus project development, manufacturing and marketing. These officers played a crucial role in Nemko's plant operations and by the close of 1988 they were helping to manage over 450 employees at the Navy Yard. By contrast, less than a dozen employees were employed in the New Jersey office.

In the face of what appears to the court to have been a monumental shift in Nemko's operations from a small job shop operating out of the Changebridge Road and Garden City offices to a major retrofit center for buses and railcars at the Brooklyn Navy Yard, United Jersey Bank points out that not all of Nemko's key officers were located in Brooklyn. Though evidence was introduced that two officers in particular, Nemko's Controller, Joseph Cerretta, and Nemko's accountant, Richard Diamond, worked primarily in New Jersey, any significance to be given to the fact that a limited number of officers and employees were retained in New Jersey is greatly outweighed by the overwhelming number of Nemko's key officers

and employees that either moved to or were hired specifically to work at the Brooklyn Navy Yard.

Consistent with the fact that by the end of 1988 Nemko's principal and key officers and employees were working at the Brooklyn Navy Yard is that during this time, Nemko was making a concerted effort to portray itself as a New York company. A company's public announcement of the location of its headquarters has been found to be an important factor in determining the location of that debtor's chief executive office. *See Mellon Bank, N.A.*, 945 F.2d at 644 (criticizing bankruptcy court determination of location of debtor's chief executive office when that determination was contrary to debtor's public announcement as to the location of its chief executive office). In the instant case, Catozzo testified that after Nemko entered into the Brooklyn Navy Yard lease in 1986, Nemko marketing letters were sent to prospective customers on Brooklyn Navy Yard letterhead. He also distributed business cards worldwide listing the Brooklyn Navy Yard as Nemko's address. In addition, Catozzo was often quoted in trade publications where he consistently characterized Nemko as a New York company and all listings of Nemko in trade publications were under the Brooklyn Navy Yard address. Perhaps, however, the most telling evidence of Nemko's effort to portray itself as a New York firm was a 1988 Nemko promotional film. The film was shot entirely in Brooklyn and features, among others, Anna Catozzo. In the film, Anna describes Nemko as a company which began in the Catozzos' home in New Jersey, but which later expanded and moved to a new building (the Brooklyn Navy Yard). The Brooklyn Navy Yard is described as Nemko's "headquarters" and a substantial portion of the narration of the film concentrates on the importance of the Brooklyn Navy Yard to Nemko based on its strategic location in New York City. Nemko's connection with New York is further emphasized by the appearance of Michael Huerta, then New York City Commissioner of Ports, International Trade and Commerce. Commissioner Huerta hails Nemko as a manufacturing success which will attract further investment in New York

and describes Nemko as "a very special case to New York City."

Contrary to this public portrayal, however, are two Dun & Bradstreet Reports and the May 11, 1989 Chase loan agreement, all of which were included as exhibits by Summit. Both Dun & Bradstreet reports were compiled in the Fall of 1988 and each lists 346 Changebridge Road, Pine Brook, New Jersey as Nemko's headquarters with the Brooklyn Navy Yard operating as a branch. Though important to a court's determination as to the location of a debtor's chief executive office, see *In re Astrocade, Inc.,* 31 B.R. at 250, the court finds that the significance of these reports pales in comparison to the actual operations of Nemko and the substantial effort of Nemko to portray itself as a New York company. Also, even though the reports list the Changebridge Road office as Nemko's headquarters, information was included which would have placed a reasonable creditor on notice that Nemko was primarily operating from the Brooklyn Navy Yard. For example, the report dated September 30, 1988 indicated that Nemko had 200 employees but only ten were located at the New Jersey office. In addition, though it lists the Brooklyn Navy Yard as a branch, the December 2, 1988 report states that "[t]his branch operates the same as headquarters."

Summit also looks to the bridge loan agreement entered into between Chase and Nemko as evidence that Nemko's chief executive office remained in Pine Brook, New Jersey. The loan agreement is comprised of several documents including a security agreement dated May 11, 1989 and two promissory notes made payable to Chase; one dated May 11, 1989 in the amount of $300,000.00 and the second dated May 17, 1989 in the amount of $600,000.00. Under the general heading of "Representations and Warranties," section 2.01 of the security agreement states that Nemko's chief executive office and the place where Nemko maintains its records is the address specified in section 6.04. Section 6.04, titled "Notices," states that all notices between the parties are to be mailed to the address provided in the signature block of the accompanying promissory note.[11] Each note in turn is signed by Anna Catozzo in her capacity as president of Nemko with 346 Changebridge Road, Pine Brook, New Jersey listed as the address for notices.

A provision in a security agreement which designates a certain address as a debtor's chief executive office is an important factor to be considered by the court. *See Mellon Bank, N.A.,* 945 F.2d at 643; *In re A.J. Gibbons Roofing and Sheet Metal, Inc.,* 139 B.R. at 656; *In re Swartz,* 62 B.R. at 90. In this instance, however, the court must question the weight to be given to the listing of 346 Changebridge Road, Pine Brook, New Jersey as Nemko's chief executive office as it appears in the May 11, 1989 security agreement. Certainly if the location of Nemko's chief executive office was of paramount importance to the parties at the time the loan was entered into, they would not have chosen such a method to designate the location of Nemko's chief executive office. The method chosen requires one to navigate through various unrelated sections of the security agreement only to then be referred to the signature page of each promissory note. Nor is it likely that the parties would provide for Nemko's chief executive office to be designated by having Anna Catozzo affix the address in handwriting under the heading "Address for Notices" at the time the note was signed. What connection, if any, the location of Nemko's chief executive office has to the location where notices under the Chase loan agreement were to be sent is unclear. Under such circumstances, it appears that the designation of 346 Changebridge Road, Pine Brook, New Jersey, as Nemko's chief executive office in the May 11, 1989 security agreement was given only consequential consideration by the parties. Thus, though it is to be considered, the court will not afford substantial weight to the designation as it appears.

Further evidence that the main part of Nemko's business was managed from the

---

**11.** The May 11, 1989 security agreement refers only to the May 11, 1989 promissory note. The May 17, 1989 promissory note, however, states that execution of the May 11, 1989 security agreement is a condition precedent to the execution of the May 17, 1989 note. The end result is that the May 11, 1989 security agreement secures both notes.

Brooklyn Navy Yard is that a substantial number of Nemko's actual business dealings with lenders and customers took place either at or from the Brooklyn Navy Yard. Catozzo testified that all negotiations with third parties took place at the Navy Yard. In fact, one of these negotiations concerned United Jersey Bank itself When Nemko exhausted its credit line with United Jersey Bank in 1987, Nemko requested a $1,900,000.00 extension. Before granting the request, United Jersey Bank sent one of its officers, Ron Marks, to inspect Nemko's facility at the Brooklyn Navy Yard. Marks not only conducted an on site inspection of the premises, but he also discussed the work being performed with officers of Toky-u Car.

In addition to face to face negotiations, negotiations through correspondence were also conducted from the Navy Yard. A prime example is Nemko's negotiations with the NYCTA concerning Nemko's bid to obtain the contract to overhaul seventy five New York City buses. Letters from the NYCTA outlining the minimum contract proposal requirements were sent to Nemko in the Fall of 1988 at the Brooklyn Navy Yard. Tom Bielecki, Vice President, Corporate Finance, and Gary Bousquet, Senior Vice President, Operations and Manufacturing, provided information to the NYCTA concerning these requirements in letters sent on Brooklyn Navy Yard letterhead. When the NYCTA awarded the contract to Nemko in February 1989, it sent notice to Nemko at the Brooklyn Navy Yard. In addition, notice of the NYCTA's subsequent modification of the contract in May 1989 was also sent to the Brooklyn Navy Yard.

Comparable to its dealings with the NYCTA was Nemko's effort to obtain the loans from the UDC and the FSC in early 1989. Nemko needed these loans in order to purchase and install the machinery required to improve Nemko's facilities at the Brooklyn Navy Yard. Letters from Nemko to both the UDC and the FSC supplying requested financial information were sent on Brooklyn Navy Yard letterhead. And similar to when Nemko was awarded the bus overhaul contract by the NYCTA, notice that Nemko was approved for the government loans was sent directly to the Brooklyn Navy Yard.

Based on the foregoing, the court finds that by the close of the first quarter of 1989,[12] the "main part" of Nemko's business, namely its bus and railcar retrofit operations, was managed from the Brooklyn Navy Yard. Thus, logic dictates that this is where creditors of Nemko would go to look for information concerning Nemko. Accordingly, the court finds that by the close of the first quarter of 1989, Nemko had transferred its chief executive office, as that term is used in section 9–103(3)(b), from 346 Changebridge Road, Pine Brook, New Jersey, to its facilities at the Brooklyn Navy Yard, located in Brooklyn, New York. As a result, the perfected status of United Jersey Bank's security interest in Nemko's accounts receivable lapsed under section 9–103(3)(e) of the New York Uniform Commercial Code sometime prior to the end of 1989. At that time, Chase's properly perfected security interest in Nemko's accounts receivable obtained priority.

Though the court has stated its conclusion, it is important to discuss further several of the arguments posed by Summit. In arguing its case, Summit relies heavily on the internal workings of Nemko in its attempt to establish the 346 Changebridge Road office as Nemko's headquarters. One such aspect was the location of Nemko's books and records. In his August 1991 deposition, Catozzo testified that Nemko's general policy was to store all originals of documents and records in New Jersey. Though a factor to be considered, see *In re Golf Course Builders Leasing, Inc.*, 768 F.2d at 1171; *In re Thompson*, 665 F.2d at 950; *In re Parker Steel Co.*, 149 B.R. at 848; *In re Swartz*, 62 B.R. at 90; *In*

12. Because Summit has admitted that it never filed a financing statement in New York, it is not necessary for the court to pinpoint an exact date for when Nemko transferred its chief executive office. As can be seen from the court's findings of fact and the evidence introduced in this case, the transfer of Nemko's chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard was a gradual process making it difficult to ascertain a specific date. It is sufficient for the court to find that the transfer was complete by the close of the first quarter of 1989.

*re Ramco Well Serv., Inc.,* 32 B.R. at 527, it is questionable in this case whether the storing of originals in New Jersey bore any relationship to where Nemko's retrofit operations were managed from. For instance, Catozzo also stated that though an attempt was made to maintain all originals in New Jersey, working copies were kept in Brooklyn where they would be accessible to those who needed them. The end result being that records were kept in both locations. In addition, it appears from Catozzo's testimony that not all records were maintained in New Jersey. For example, Catozzo testified that records pertaining to inventory were stored in computers at the Brooklyn Navy Yard. Also, the maintenance of technical records, which was originally the responsibility of the New Jersey office, gradually shifted to Brooklyn as Nemko's operations at the Navy Yard increased.

Perhaps the strongest argument posed by Summit in support of its claim that Nemko's chief executive office remained in New Jersey is that Nemko's financial affairs were, for the most part, managed from the 346 Changebridge Road office. Courts recognize that the management of day to day financial affairs is often an integral part of the overall management of a debtor. For this reason, where a debtor manages its financial affairs plays an important role in determining the location of that debtor's chief executive office. *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d at 1170 (location of debtor's accountant as indication of chief executive office); *In re Astrocade, Inc.,* 31 B.R. at 250 (location of bookkeeping, accounting and invoicing as indication of chief executive office). As stated earlier, Nemko's Controller, Joseph Cerretta, and Nemko's accountant, Richard Diamond, worked primarily in New Jersey and were not included in the transition from 346 Changebridge Road to the Brooklyn Navy Yard. Nemko's payroll was prepared at 346 Changebridge Road and all payroll records stored there. Accounts payable as well as accounts receivable were prepared and maintained in New Jersey though equipment and inventory purchasing gradually became the responsibility of the Brooklyn office. Tax matters were also handled from New Jersey.

Withholding taxes and corporate tax returns were prepared at 346 Changebridge Road.

Though the fact that Nemko's financial affairs were managed from 346 Changebridge Road could be taken to suggest that, on the whole, Nemko was managed from New Jersey, the court does not find this factor sufficient in itself to justify a finding that Nemko's chief executive office remained in New Jersey. Even when considered in conjunction with other factors which might favor a finding of 346 Changebridge Road as Nemko's chief executive office, the limited nature of Nemko's operations at 346 Changebridge Road are not enough to overcome the overwhelming evidence pointing to the Brooklyn Navy Yard as Nemko's chief executive office. Outside of Cerretta and Diamond, every key officer and employee of Nemko was working out of Brooklyn by the close of 1988. Most important of these officers and employees was, of course, Dino Catozzo, a principal of Nemko. At the same time, Nemko was undertaking a concerted effort to portray itself to the public as a New York company by disseminating information worldwide listing the Brooklyn Navy Yard as Nemko's address. Lastly, substantial evidence was submitted by both parties demonstrating that Nemko actually negotiated and dealt with its creditors at or from the Brooklyn Navy Yard.

The court also finds that the evidence relied on by Chase, namely that concerning the location of Nemko's officers and employees, its public portrayal as a New York company and its dealings with creditors more closely fits the type of evidence that is to be given the most weight under the *Mellon* approach than does evidence concerning the location of Nemko's records and accounting functions. In *Mellon,* the Third Circuit Court of Appeals reversed the district court's affirmance of the bankruptcy court's finding that the debtor transferred its chief executive office from Rockville, Maryland to Pittsburgh, Pennsylvania by September 1984. The court relied in part on the fact that the bankruptcy judge had focused too heavily on internal documents pertaining to the "power structure of affiliated corporations." *Mellon Bank, N.A.,* 945 F.2d at 643. The *Mellon*

court favored instead an examination based on information more readily available to creditors, such as a debtor's public announcement of the location of its headquarters. Though *Mellon* dealt with the interworkings between a subsidiary and its parent and not two offices of the same company, the court finds the analysis relevant to this case. Where Nemko decided to store its records or what office its accountants worked out of is information not readily available to the public, much like the internal memoranda in *Mellon*. It is impractical and illogical for a court to favor that type of evidence when, as in this case, a debtor widely disseminated information to the public concerning the location of its chief executive office. *See Mellon Bank, N.A.*, 945 F.2d at 643.

Though certainly a case of conflicting evidence, the court finds that Nemko transferred its chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard at some point prior to the close of the first quarter of 1989. Following the transfer, Summit Bank, as successor in interest to United Jersey Bank, failed to protect the priority of its security interest in Nemko's accounts receivable when it failed, for whatever reason, to file the required financing statements in New York. Accordingly, Chase's motion for summary judgment is granted and that of Summit Bank is denied.

In its post remand memorandum of law, Chase, for the first time, requested that it be awarded prejudgment interest on whatever recovery it is entitled to. As mentioned previously, Chase claims that Summit received two payments stemming from Nemko's receipt of the NYCTA account receivable: one on October 28, 1992 in the amount of $363,181.00 and a second on November 18, 1992 in the amount of $286,075.00. No mention is made of who made these payments to Summit nor is any evidence provided to support Chase's assertion that the payments were made. (*See* Mem. on Remand in Support of The Chase Manhattan Bank N.A.'s Cross Mot. for Summ. J., at 25). Thus, even assuming that Chase is entitled to prejudgment interest, there is no evidentiary basis for the court to determine the amount of interest that would be due or when that interest began to accrue. The court believes that the more prudent course is to require Summit to turn over to Chase any funds Summit received on account of the NYCTA account receivable. Should the parties desire, an evidentiary hearing will be scheduled to consider all legal and evidentiary issues concerning the amount of the NYCTA account receivable and Chase's entitlement, if any, to prejudgment interest. Counsel to Chase is directed to settle an order consistent with this opinion.

## CONCLUSION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding as stated in 28 U.S.C. § 157(b)(2)(K).

2. By the close of the first quarter of 1989, Nemko transferred its chief executive office, as that term is used in section 9-103(3)(b) of the New York Uniform Commercial Code, from 346 Changebridge Road, Pine Brook, New Jersey, to its facilities at the Brooklyn Navy Yard, located in Brooklyn, New York

3. Following the transfer of Nemko's chief executive office, Summit Bank failed to preserve the priority of its security interest in Nemko's accounts receivable when it failed to file a financing statement in New York as required by section 9-103(3)(b) of the New York Uniform Commercial Code.

4. Chase holds a first priority lien on Nemko's accounts receivable, including the receivable created upon Nemko's completion of its bus overhaul contract with the New York City Transit Authority.

5. Chase's October 18, 1991 cross motion for summary judgment is granted and Summit is directed to turn over to Chase any funds it received that were derived from Nemko's account receivable which was created upon Nemko's completion of the NYCTA contract. Summit's April 15, 1991 motion for summary judgment is denied.